(No. 84418.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. IKE J. EASLEY, JR., Appellant.

*Opinion filed May 25, 2000.—Rehearing denied October 2, 2000.*

308

310

HARRISON, C.J., concurring in part and dissenting in part.

Aviva Futorian, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and William L. Browers and Lisa Anne Hoffman, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Ike Easley, Jr., petitioned the circuit court of Livingston County for post-conviction relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 1998)). The circuit court dismissed defendant's petition without an evidentiary hearing. Defendant appeals directly to this court. 134 Ill. 2d R. 651(a). We affirm.

## BACKGROUND

Defendant was charged with conspiring to murder (Ill. Rev. Stat. 1987, ch. 38, pars. 8—2(c), 9—1(a)) and with murdering (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2)) the victim, Robert Taylor, who was a superintendent at the Pontiac Correctional Center (Pontiac). The State's theory of the case was as follows. Defendant was a member of a street gang. The gang blamed the prison administration for the death of Billy Jones, another gang member. Defendant murdered the victim to avenge Jones' death. *People v. Easley*, 148 Ill. 2d 281,

324-26 (1992). For a fuller understanding of the underlying facts, see also *People v. Lucas*, 151 Ill. 2d 461 (1992); *People v. Johnson*, 250 Ill. App. 3d 887 (1993).

Prior to defendant's trial, the State dismissed the conspiracy charges. At the close of the evidence, a jury found defendant guilty of first degree murder, in that he intended to kill the victim. See Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1). At the first stage of the death sentencing hearing, the same jury found that defendant was eligible for the death penalty because the victim was a correctional officer. See Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(2). At the close of the second stage of the death sentencing hearing, the jury concluded that there were no mitigating factors sufficient to preclude imposition of the death penalty. Accordingly, the circuit court sentenced defendant to death.

Defendant's sentence was stayed pending direct appeal to this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). This court affirmed defendant's conviction and sentence. *People v. Easley*, 148 Ill. 2d 281 (1992). The United States Supreme Court denied defendant's petition for a writ of *certiorari. Easley v. Illinois*, 506 U.S. 1082, 122 L. Ed. 2d 361, 113 S. Ct. 1055 (1993).

In July 1993 defendant filed in the circuit court a petition for post-conviction relief. In January 1997 defendant filed a second amended petition. On August 14, 1997, the circuit court, in the person of the same judge who presided at defendant's trial, granted the State's motion to dismiss the petition without an evidentiary hearing. We will discuss additional relevant facts in the context of the issues raised on appeal.

## DISCUSSION

A proceeding brought under the Post-Conviction Hearing Act (Act) is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment. The purpose of the proceeding is to resolve

allegations that constitutional violations occurred at trial, when those allegations have not been, and could not have been, adjudicated previously. To be entitled to post-conviction relief, the petitioner bears the burden of establishing a substantial deprivation of constitutional rights. Also, determinations of the reviewing court on the prior direct appeal are *res judicata* as to issues actually decided; issues that could have been presented on direct appeal but were not are deemed waived. *People v. Evans*, 186 Ill. 2d 83, 89 (1999); *People v. Tenner*, 175 Ill. 2d 372, 377-78 (1997).

The petitioner in a post-conviction proceeding is not entitled to an evidentiary hearing as of right. Rather, the Act permits summary dismissal of a nonmeritorious petition. The allegations in the petition, supported where appropriate by the trial record or accompanying affidavits, must show a substantial violation of constitutional rights. *Evans*, 186 Ill. 2d at 89; *People v. Caballero*, 126 Ill. 2d 248, 259 (1989). For the purpose of determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in any accompanying affidavits, in light of the original trial record, are to be taken as true. *Evans*, 186 Ill. 2d at 89; *People v. Coleman*, 183 Ill. 2d 366, 380-82 (1998). The circuit court's dismissal of a post-conviction petition is reviewed *de novo. Coleman*, 183 Ill. 2d at 387-89.

On appeal, defendant contends that he was denied his constitutional rights due to the: (1) ineffective assistance of counsel at trial and on direct review; and (2) unreasonable disparity between his death sentence and the sentences of others involved in the murder.

## I. Ineffective Assistance of Counsel

Defendant claims that he was denied his constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Defendant contends that his trial counsel was constitutionally inef-

fective because trial counsel: (A) failed to seek a fitness hearing; (B) failed to object to the prosecution's discriminatory use of a peremptory challenge to exclude an African-American venireperson from the jury; (C) failed to object to the State's introduction of evidence relating to street gangs and introduced such evidence as part of the defense; (D) failed to object to the State's introduction of other prejudicial evidence and improper cross-examination; and (E) failed to investigate and present evidence at the death sentencing hearing.

To establish a claim of ineffective assistance of counsel, a defendant must satisfy the familiar *Strickland* test. See *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). The test is composed of two prongs: deficiency and prejudice. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; see *People v. Brisbon*, 164 Ill. 2d 236, 245-46 (1995).

First, the defendant must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the "counsel" guaranteed by the sixth amendment. A court measures counsel's performance by an objective standard of competence under prevailing professional norms. To establish deficiency, the defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy. *Evans*, 186 Ill. 2d at 93; *People v. Hampton*, 149 Ill. 2d 71, 108-09 (1992).

Second, the defendant must establish prejudice. The defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. The prejudice prong of *Strickland* entails more than an "outcome-determinative" test. The defendant must show that

counsel's deficient performance rendered the result of the proceeding unreliable or fundamentally unfair. *Evans*, 186 Ill. 2d at 93; *People v. Mahaffey*, 165 Ill. 2d 445, 458 (1995).

A defendant must satisfy both prongs of the *Strickland* test. Therefore, "failure to establish either proposition will be fatal to the claim." *People v. Sanchez*, 169 Ill. 2d 472, 487 (1996); accord *People v. Guest*, 166 Ill. 2d 381, 390 (1995).

### A. *Fitness Hearing*

Defendant claims that he did not receive effective assistance of counsel because his trial counsel failed to request a fitness hearing. The State initially responds that defendant waived this claim because he did not raise it on direct review. However, we agree with defendant that this claim is not waived because defendant now presents evidence that did not appear on the face of the record and was not available to defense counsel on direct appeal. See *People v. Owens*, 129 Ill. 2d 303, 308-09 (1989).

The prosecution of a defendant who is not fit to stand trial violates due process. *People v. Haynes*, 174 Ill. 2d 204, 226 (1996); *People v. Murphy*, 72 Ill. 2d 421, 430 (1978). In Illinois, a defendant is presumed to be fit to stand trial, and will be considered unfit only if, because of the defendant's mental or physical condition, the defendant is unable to understand the nature and purpose of the proceedings against him or her, or to assist in his or her defense. Ill. Rev. Stat. 1989, ch. 38, par. 104—10, now codified at 725 ILCS 5/104—10 (West 1998). A defendant is entitled to a fitness hearing only when a *bona fide* doubt of the defendant's fitness is raised. Ill. Rev. Stat. 1989, ch. 38, par. 104—11(a), now codified at 725 ILCS 5/104—11(a) (West 1998); *People v. Johnson*, 183 Ill. 2d 176 (1998).

Therefore, to establish that his trial counsel's alleged

incompetency prejudiced him within the meaning of *Strickland*, defendant must show that facts existed at the time of his trial that would have raised a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings and to assist in his defense. Defendant is entitled to relief on this post-conviction claim only if he shows that the trial court would have found a *bona fide* doubt of his fitness and ordered a fitness hearing if it had been apprised of the evidence now offered. See *Johnson*, 183 Ill. 2d at 193, citing *People v. Eddmonds*, 143 Ill. 2d 501, 512-13 (1991); accord *Eddmonds v. Peters*, 93 F.3d 1307, 1316-17 (7th Cir. 1996). Since defendant's post-conviction petition was dismissed without an evidentiary hearing, "[t]he critical inquiry is whether the facts presented in defendant's post-conviction petition raised a *bona fide* doubt of his fitness to stand trial." *Johnson*, 183 Ill. 2d at 193.

Relevant factors that a trial court may consider in assessing whether a *bona fide* doubt of fitness exists include a defendant's irrational behavior, the defendant's demeanor at trial, and any prior medical opinion on the defendant's competence to stand trial. There are " 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.' " *Eddmonds*, 143 Ill. 2d at 518, quoting *Drope v. Missouri*, 420 U.S. 162, 180, 43 L. Ed. 2d 103, 118, 95 S. Ct. 896, 908 (1975).

In the present case, defendant contends that his trial counsel had ample evidence to have raised a *bona fide* doubt as to his fitness to stand trial. We disagree. None of defendant's evidence raises a *bona fide* doubt of his fitness.

Prior to trial, defendant's trial counsel arranged for a psychologist to evaluate defendant to develop possible

mitigation evidence at the sentencing hearing. However, trial counsel failed to inform defendant of the evaluation. Defendant believed that the State had sent the psychologist and refused to cooperate. "Defendant's unwillingness to cooperate with counsel cannot be deemed equivalent with an inability to do so." *People v. O'Neal*, 62 Ill. App. 3d 146, 149 (1978).

In an affidavit attached to his post-conviction petition, defendant averred as follows. If he knew that his trial counsel, rather than the State, sent the psychologist to examine him, he would have cooperated. Indeed, he actually asked trial counsel for "a physical examination and a brain scan" because he believed that something was "wrong with [his] brain." He experienced "a lot of headaches." He stated: "Sometimes when I get angry or upset, I kind of blank out—my mind goes blank; my nerves jump and I can't think clearly." When defendant read or spoke, he forgot everything that he was reading or thinking.

This evidence does not help defendant. Fitness speaks only to a person's ability to function within the context of a trial. It does not refer to sanity or competence in other areas. A defendant can be fit for trial although his or her mind may be otherwise unsound. *Murphy*, 72 Ill. 2d at 432-33; accord *People v. Griffin*, 178 Ill. 2d 65, 79 (1997).

Also, defendant made several irrational statements during the course of the trial. For example, at a pretrial hearing, defendant made an outburst in which he complained of his prison clothing and requested to be absent during *voir dire*. The following colloquy occurred:

"THE COURT: Mr. Easley, there is a difference between you and [trial counsel] at this time I [am] going to simply resolve by saying yes, you need to be present. You have not only a constitutional right to be present but you would, in my opinion, severely jeopardize or potentially jeopardize your case if you were not here when the jurors were here

and being selected. You have a right to look over the people who decide your fate.

MR. EASLEY: What do you think I am?

THE COURT: You have a right to tell your lawyer I don't want that juror. I don't care what that juror's answers were, I have a certain number of challenges I can use and this ultimately—

MR. EASLEY: I understand all of that.

THE COURT: This is your case. This is your life hanging on the line.

MR. EASLEY: My life ain't worth a damn whether I am in the penitentiary, whether I get natural life or ending up with the death penalty. Anyway I lose my life. I have lost half of it already.

\* \* \*

THE COURT: \*\*\* I understand Mr. Easley is very upset about the court procedure he is going through each day \*\*\*. I understand he doesn't want to have to go through those searches each time he comes into the courtroom and I understand he feels those are offensive and he shouldn't have to do that and I have thought seriously of his request not to have to go through that and for reasons that I am not prepared to talk about right now, I can't honor his request but I understand why he makes it and feels it is humiliating and undignified and why it upsets him but I am not prepared to say that isn't going to happen. I understand how Mr. Easley feels about it but it is critically important to him that he be here during his trial, that he help his lawyer in every way he can. He says [that his] life isn't worth anything and essentially [that he does not] care. I fundamentally don't believe that.

MR. EASLEY: I care about myself but some of you—I am no longer in control of my life. I am being catered to like a little kid. I am under the Department of Corrections. \*\*\* How in the hell is that in control of my life?''

This colloquy shows that defendant understood the nature of the proceeding. The record shows that this outburst, along with another at the beginning of the second stage of the sentencing hearing, was based not on defendant's unfitness, but rather on his belief that the

criminal justice system demeaned him, particularly by the courthouse searches. See, *e.g.*, *People v. Chatman*, 36 Ill. 2d 305, 310 (1967) (hostile conduct attributable to belief that defendant was not receiving a fair trial).

Defendant also notes that the warden of his prison put defendant essentially on a "suicide watch" after his conviction in the guilt phase of this trial. However, the record shows that this was a policy of this particular warden. Indeed, the warden's action angered defendant; prior to the start of the penalty phase of this trial, he expressly stated that he had no intention of killing himself. In any event, a suicide attempt "does not by itself demonstrate that a defendant is unfit." *Sanchez*, 169 Ill. 2d at 483.

Defendant points also to psychological examinations that post-conviction counsel procured six years subsequent to defendant's trial. These examinations indicate that defendant had long-standing mental problems at the time of trial that affected his ability to understand written and oral instructions. When under extreme stress, defendant suffered from thought and personality disorder, paranoia, and episodic breaks with reality. Affidavits from defendant's mitigation witnesses accord with this diagnosis.

Again, however, a defendant may be fit for trial although his or her mind may be otherwise unsound. The fact that a defendant suffers from mental disturbances or requires psychiatric treatment does not necessarily raise a *bona fide* doubt as to the defendant's ability to understand the proceedings and to assist counsel in the defense. *Eddmonds*, 143 Ill. 2d at 519; *People v. Heral*, 62 Ill. 2d 329, 336 (1976); *People v. Bivins*, 97 Ill. App. 3d 386, 389 (1981).

We take as true defendant's allegations that he suffers from mental impairments. See *Coleman*, 183 Ill. 2d at 380-82. However, that does not necessarily mean that

he was unfit for trial. The issue is not mental illness, but whether defendant could understand the proceedings against him and cooperate with counsel in his defense. If so, then, regardless of mental illness, defendant will be deemed fit to stand trial. See *Eddmonds*, 93 F.3d at 1314. We conclude that defendant's post-conviction petition does not raise a *bona fide* doubt of his fitness to stand trial. Thus, defendant's claim of ineffective assistance of counsel necessarily fails. See *Johnson*, 183 Ill. 2d at 193; *People v. Walker*, 262 Ill. App. 3d 796, 803-04 (1994). We uphold the circuit court's dismissal of this claim.

## B. *Batson Claim*

Defendant next alleges that the State engaged in purposeful racial discrimination by using a peremptory challenge to exclude an African-American venireperson from the jury. See *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). Defendant erroneously claims that he received ineffective assistance of his trial counsel because counsel failed to include this issue in his post-trial motion. Such a failure cannot be considered constitutionally ineffective because it was not necessary for trial counsel to preserve the issue for appellate review. See *People v. Mitchell*, 152 Ill. 2d 274, 284-85 (1992). However, defendant also claims that his appellate counsel was ineffective for failing to raise this issue on direct review.

*Batson* established a three-step analysis to determine whether or not the State used its peremptory challenges to remove venirepersons on the basis of race. First, the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. *People v. Munson*, 171 Ill. 2d 158, 174 (1996); *People v. Hudson*, 157 Ill. 2d 401, 425 (1993).

Second, if the defendant has made a *prima facie* showing, the burden then shifts to the State to provide a race-neutral explanation for excluding each venireperson

in question. A race-neutral explanation is one based upon something other than the race of the venireperson. In assessing an explanation, the trial court focuses on the *facial* validity of the prosecutor's explanation. The explanation need not be persuasive, or even plausible. A legitimate reason is not a reason that makes sense, but rather is a reason that does not deny equal protection. Absent an inherent discriminatory intent in the prosecutor's explanation, the reason offered will be deemed race-neutral. *Munson*, 171 Ill. 2d at 174-75. Defense counsel then may rebut the prosecutor's reasons as being pretextual. *Mitchell*, 152 Ill. 2d at 288.

Third, the trial court then weighs the evidence in light of the *prima facie* case, the prosecutor's reasons for challenging the venireperson, and any rebuttal by defense counsel. *Mitchell*, 152 Ill. 2d at 288. The court must determine whether the defendant has met his or her burden of proving purposeful discrimination. *Munson*, 171 Ill. 2d at 174.

Defendant alleges that the State used a peremptory challenge to exclude 72-year-old Willie Stegall from the jury solely because he is African-American. The exclusion of even one prospective juror on account of race is unconstitutional and requires reversal of a defendant's conviction. *People v. Andrews*, 155 Ill. 2d 286, 294 (1993).

During *voir dire*, the prosecutor asked Stegall whether any family members had ever received anything more severe than a parking ticket or had any other contacts with the police. Stegall answered that he did not know because his children had not lived with him for 20 years. After questioning from both sides, the prosecutor moved to excuse Stegall for cause. Two of Stegall's children had recently been convicted of drug-related offenses and had been placed on probation. The prosecutor believed that Stegall lied regarding whether anyone in his family had contact with the police. The trial court

denied the motion. The court reasoned that Stegall did not know the details of his children's lives since they had left home years before.

The State then used a peremptory challenge to exclude Stegall. Defendant raised a *Batson* objection. The trial court then offered the State an opportunity to assert for the record that Stegall should have been excluded for cause. The prosecutor responded by volunteering three race-neutral reasons for exercising a peremptory challenge to exclude Stegall. The trial court never determined whether defendant established a *Batson prima facie* case. However, the court did find that the State had an adequate race-neutral reason for exercising the peremptory challenge. Thus, we need focus only on whether the State's reasons were neutral and valid. See *Mitchell*, 152 Ill. 2d at 289-90.

First, the prosecutor stated that he excluded Stegall because he lied about not knowing of his children's problems with the law. Defendant counters that this reason was pretextual. He notes that the trial court rejected this explanation in denying the State's motion to excuse Stegall for cause. Defendant further contends that the record does not confirm this explanation. However, the prosecutor's explanation need not rise to the level that justifies a challenge for cause. *Munson*, 171 Ill. 2d at 177; *Mitchell*, 152 Ill. 2d at 291.

Defendant further suggests that the prosecutor should have asked Stegall supplemental questions regarding his children's problems with the law. However, the prosecutor's failure to pose additional questions does not lead to the conclusion that this reason was a mere pretext for racial discrimination. See *People v. Wiley*, 165 Ill. 2d 259, 276 (1995).

Second, the prosecutor stated that he excluded Stegall because Stegall's neighborhood had experienced street gang activity. The court in *Williams v. Chrans*, 957 F.2d

487 (7th Cir. 1992), recognized the potential problem with this explanation:

"Gangs with black members will frequently operate in areas populated primarily by residents who are also black. Allowing the exclusion of black venirepersons simply because their home or place of work is in a gang area has an enormous potential to disproportionately exclude black jurors in most cases involving black gang members." *Williams*, 957 F.2d at 489-90.

However, it is settled that the disproportionate impact of a prosecutor's criteria for excluding venirepersons does not by itself compel a finding that his or her motives were discriminatory. "Unless the [prosecutor] adopted a criterion with the intent of causing the impact asserted, that impact itself does not violate the principle of race neutrality." *Hernandez v. New York*, 500 U.S. 352, 362, 114 L. Ed. 2d 395, 407, 111 S. Ct. 1859, 1867 (1991); accord *Williams*, 957 F.2d at 490.

Illinois courts have allowed the State to exclude a venireperson if he or she lives in an area that has experienced gang activity. See, *e.g.*, *People v. Morales*, 308 Ill. App. 3d 162, 172 (1999); *People v. Nunn*, 273 Ill. App. 3d 519, 525-26 (1995); *People v. Williams*, 252 Ill. App. 3d 635, 644 (1993); accord *Holder v. Wilborn*, 60 F.3d 383, 390 (7th Cir. 1995) (gang-area justification acceptable under *Batson*). It was the State's theory of the case that defendant, a gang member, killed the victim in retaliation against the prison administration for the death of a member of defendant's gang. *Easley*, 148 Ill. 2d at 324-26. This reason, therefore, was especially relevant here. See *United States v. Williams*, 936 F.2d 1243, 1247 (11th Cir. 1991) (collecting cases upholding peremptory challenges based on geographical relationship between venireperson and case to be tried). This is a race-neutral reason for excluding Stegall.

Third, the prosecutor stated that he excluded Stegall because he vacillated on the topic of capital punishment,

and hesitated when asked whether he could impose the death penalty. Demeanor constitutes a legitimate race-neutral reason for exercising a peremptory challenge. *Munson*, 171 Ill. 2d at 178 (collecting cases); *Wiley*, 165 Ill. 2d at 274-75; *Hudson*, 157 Ill. 2d at 433.

However, demeanor-based explanations must be closely scrutinized. A prosecutor's perception of a venireperson's demeanor is subjective and can be easily used as a pretext for discrimination. *Wiley*, 165 Ill. 2d at 274-75; *Hudson*, 157 Ill. 2d at 433. Defendant now contends that this proffered explanation is pretextual because the prosecutor accepted three white venirepersons to serve on the jury "who expressed a similar or lesser degree of tentative support for the death penalty."

We cannot accept this argument. In many cases a peremptory challenge is based on a combination of traits. There will be no single criterion that serves as the basis for the exclusion of a particular venireperson. Purposeful discrimination by the State is not automatically established by the mere coincidence that an excluded venireperson shared a characteristic with a juror who was not challenged. The excluded venireperson may possess an additional trait that caused the prosecutor to consider the venireperson unacceptable. Conversely, the juror who was not challenged may possess an additional trait that prompted the prosecutor to consider the juror acceptable. *Wiley*, 165 Ill. 2d at 282-83 (and cases cited therein).

In this case, defendant argues that other, white venirepersons vacillated on the topic of the death penalty and expressed the same degree of hesitation as Stegall on whether they could impose it. Accepting this argument, this is the only trait that Stegall and the accepted jurors shared. Since Stegall was excluded based on a combination of factors, he was not similarly situated to these white jurors. Stegall possessed two additional undesirable traits that distinguished him from these other

jurors. The prosecutor believed that Stegall lied about not knowing of his children's problems with the law, and that Stegall's neighborhood had experienced gang activity. These distinguishing characteristics were sufficient to explain the prosecutor's alleged inconsistency in accepting these other jurors, but excluding Stegall. See, e.g., *Hudson*, 157 Ill. 2d at 430-34; *Mitchell*, 152 Ill. 2d at 293-96.

In sum, we find no inherent discriminatory intent in the State's explanation for excluding Stegall. Accordingly, we deem the State's reasons to be valid and race-neutral. This claim was properly dismissed by the circuit court.

### C. *Gang Evidence*

Defendant next claims that he did not receive effective assistance of counsel because trial counsel: (1) failed to object to the State's introduction of evidence relating to street gangs, and (2) introduced such evidence as part of the defense. We note that the State contends that defendant has waived these claims of ineffective assistance of trial counsel because he could have raised them on direct review. However, defendant also alleges that his appellate counsel was ineffective for failing to raise on direct review these allegations of trial counsel's ineffectiveness. A criminal defendant is guaranteed the effective assistance of appellate counsel as of right, and a claim of ineffective assistance thereof is cognizable under the Act. The waiver rule should not bar consideration of an issue where the alleged waiver stems from incompetency of appellate counsel. *People v. Mack*, 167 Ill. 2d 525, 531-32 (1995).

A court uses the *Strickland* analysis also to test the adequacy of appellate counsel. A defendant who contends that appellate counsel rendered ineffective assistance, e.g., by failing to argue an issue, must show that the failure to raise that issue was objectively unreasonable and

that the decision prejudiced the defendant. Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong. Accordingly, unless the underlying issues are meritorious, defendant has suffered no prejudice from counsel's failure to raise them on appeal. *People v. Childress*, 191 Ill. 2d 168, 175 (2000); *People v. West*, 187 Ill. 2d 418, 435 (1999) (and cases cited therein).

## 1. Failure to Object

The State introduced evidence concerning defendant's membership in a street gang and that gang's involvement in the victim's murder. Defendant now argues that his appellate counsel was constitutionally deficient for failing to argue that trial counsel should have objected to the State's introduction of this evidence. This issue is barred by operation of *res judicata*. A petitioner cannot obtain relief under the Act by rephrasing in constitutional terms issues which were previously addressed, such as ineffective assistance of counsel. *People v. Flores*, 153 Ill. 2d 264, 277-78 (1992) (and cases cited therein). On direct review, this court held that although the admission of this gang-related evidence was improper, defendant suffered no prejudice therefrom. *Easley*, 148 Ill. 2d at 323-33. Defendant cannot now argue that appellate counsel was ineffective for failing to argue that trial counsel should have objected to what this court has previously concluded to be nonprejudicial. See *Evans*, 186 Ill. 2d at 103.

## 2. Introduction by Defense

Defense witness Dennis Fox was a Pontiac inmate and a member of defendant's gang. Defendant's trial counsel elicited from Fox testimony that members of defendant's gang roamed at will in the vicinity of the

murder, that they could kill anyone they wished, and that they would kill any eyewitness to a gang killing.

The State's evidence against defendant included two eyewitnesses to the murder. *Easley*, 148 Ill. 2d at 292-93. The record shows that defense counsel presented several witnesses such as Fox who testified not only that the State's eyewitnesses were not where they testified they were, but further, that there *could not have been* any eyewitnesses. If there were, defendant's gang would have killed them.

Defendant now contends that appellate counsel should have argued that trial counsel's strategy was constitutionally deficient and prejudicial. As with defendant's failure to object to the State's introduction of gang evidence, this issue is *res judicata* (*Flores*, 153 Ill. 2d at 277-78). *Easley*, 148 Ill. 2d at 323-33. Defendant cannot now argue that appellate counsel was ineffective for failing to argue that trial counsel improperly admitted evidence that this court has previously concluded to be nonprejudicial.

However, as evidence of prejudice from appellate counsel's conduct, defendant attached to his postconviction petition affidavits of several jurors from defendant's trial. The jurors averred essentially that they felt uneasy about street gangs, and they feared gang retaliation. According to defendant, this evidence shows that he was prejudiced by his trial counsel's introduction of gang-related evidence.

The jurors' affidavits cannot help defendant. "It is well established that a statement by a juror taken after the jury has rendered its verdict, has been polled in open court, and has been discharged will not be admitted to impeach a juror's verdict." *People v. Brisbon*, 164 Ill. 2d 236, 257 (1995) (and cases cited therein). "How or why the jury reached its decision collectively or how or why individual jurors considered the evidence are not matters

of proper inquiry after the verdict has been reached." *People v. Chatman*, 52 Ill. App. 3d 631, 634-35 (1977). We do not consider the jurors' affidavits.

Defendant also attached to his post-conviction petition a report by John Hagedorn, who is a sociologist and an expert on street gangs. In his report, he conceded that the gang-related evidence may not have changed the outcome of the guilt phase of the trial. However, he opined that the gang-related evidence "exercised considerable influence on the jury in the penalty phase of the trial. In other words, if the gang issue had not been such a major focus of the trial, I believe the jury would have been substantially less likely to ask for the death penalty."

We disagree. We conclude that defendant fails the prejudice prong of the *Strickland* test. On direct review, this court concluded:

> "Regardless, though, of whether the case had been submitted to the jury with or without the gang evidence, the jury would still have been presented with the testimony of the eyewitnesses to the murder as well as the physical evidence in support of the State's case against defendant. Accordingly, we hold that defendant was not denied his right to a fair and impartial trial by the introduction of the gang evidence." *Easley*, 148 Ill. 2d at 330.

We note that, in contrast to the guilt phase of the trial, the gang-related evidence was admissible at the penalty phase. See *People v. Brown*, 172 Ill. 2d 1, 47-48 (1996) (and cases cited therein).

Thus, in terms of the prejudice prong of the *Strickland* test, we conclude that there is no reasonable probability that, but for the introduction of gang evidence by defendant's trial counsel, the result of the guilt phase of the trial would have been different. Also, due to the aggravation evidence, which we will discuss later, this conclusion applies likewise to the penalty phase of the trial. Therefore, appellate counsel was not constitution-

ally deficient for failing to argue the issue. The circuit court properly dismissed this claim.

### D. *Failure to Object: Improper Cross-Examination*

Defendant next claims that he did not receive effective assistance of counsel because trial counsel failed to object to: (1) a statement by a prison investigator that defendant invoked his right to remain silent after he had received *Miranda* warnings; (2) the prosecutor's improper elicitation of testimony, on cross-examination of a defense witness, that his aggravated battery conviction had been reduced from attempted murder; and (3) the prosecutor's insinuation, in cross-examining another defense witness, that the witness had changed his story, without evidentiary support. Defendant also alleges that his appellate counsel was ineffective for failing to raise on direct review these allegations of trial counsel's incompetence.

Defendant raised these instances of the prosecutor's allegedly improper cross-examination on direct review. This court held that defendant waived review of these issues, and that the prosecutor's conduct did not rise to the level of plain error. *Easley*, 148 Ill. 2d at 321-23, 336. Since the actions complained of did not rise to the level of plain error, the failure of defendant's trial counsel to object thereto did not prejudice defendant under *Strickland*. See, *e.g.*, *People v. Shaw*, 186 Ill. 2d 301, 330-32 (1998); *People v. Williams*, 181 Ill. 2d 297, 322-26 (1998). Trial counsel cannot be deemed ineffective for failing to preserve these issues for review; correspondingly, incompetence cannot be assigned to appellate counsel. The circuit court properly dismissed this claim.

Defendant also claims that the cumulative effect of his trial counsel's evidentiary errors deprived him of effective assistance of counsel at the guilt phase of the trial. Defendant contends that, but for these errors, there is a reasonable probability that the outcome of the trial would have been different. The circuit court properly

dismissed this claim. We have rejected each of these claims. Thus, there can be no cumulative effect. See *Evans*, 186 Ill. 2d at 103.

### E. *Death Sentencing Hearing*

Defendant next claims that he did not receive effective assistance of counsel at the second stage of the death sentencing hearing. He contends that his trial counsel failed to investigate and introduce mitigation evidence.

The State's aggravation evidence at the hearing focused on defendant's crime for which he was imprisoned and his prison conduct. The victim in that case, William Paschal, was the common law husband of defendant's sister Carolyn, now deceased. Defendant's family lived with Carolyn and Paschal. On January 21, 1982, defendant broke into their apartment, found the unarmed Paschal in the living room, swore at him, and then shot him once in the chest. Defendant shot Paschal twice more as Paschal attempted to flee, once in the side and once in the back of the head. Two eyewitnesses, defendant's sister Lorraine and his brother Jerome, related these events to Chicago Police Detective Thomas Ptak. Lorraine and Jerome were then teenagers; defendant was then 19 years old. Defendant surrendered to police 10 days later. He was convicted of murder and sentenced to a term of imprisonment.

During his imprisonment for the murder of Paschal, in April 1983, Martin Yallaly, a supervisor at Menard Correctional Center, saw defendant and two other inmates assault an inmate. Yallaly saw that defendant was armed, but could not identify what type of weapon he had. Later, three deadly homemade weapons were found in the area of the assault.

In February 1984, a corrections officer at Menard searched defendant's cell for, *inter alia*, contraband and weapons. The officer found an eight-inch sharpened knife hidden in one of defendant's shoes.

In January 1986, defendant struck a corrections officer at Pontiac. Lieutenant Mark Pierson and two other officers were searching an inmate's cell. As defendant was walking by the cell, he stopped and asked Pierson what he was doing. Pierson ordered defendant to go to his cell. Defendant refused and attempted to enter the cell. Pierson grasped defendant's arm to lead defendant back to his own cell. Defendant then punched Pierson in the eye.

In November 1987, defendant was ordered to appear in court. He was taken from his cell to the admit building. Lieutenant Frank Ragusa, a corrections officer at Pontiac, took defendant to a room to be strip-searched. It was standard procedure for any inmate leaving the prison to be searched for contraband. Defendant was handcuffed to a chained belt around his waist. While Ragusa was undoing the handcuffs, defendant stated, "yeah, I got something," and punched Ragusa in the jaw.

From June 1982 through 1989, the Department of Corrections issued 154 disciplinary reports to defendant while he was an inmate at Pontiac. Six of the reports were for assault—five assaults on prison staff and one on another inmate; 30 for insolence or threats; 52 for disobeying orders; 64 for unauthorized movement; three for gang activity; four for dangerous contraband; and two for drugs and paraphernalia. The aggravation evidence also included the evidence adduced at trial.

Defendant's trial counsel presented mitigation evidence pertaining to defendant's troubled social history, his psychological impairments, and the Paschal murder.

Defendant's mother, Ray Jean Easley, was 16 years old when defendant was born. According to defendant's mother, defendant "was born with a mental problem" and had been "a problem child" since birth. He avoided bathing and wet his bed as a teenager. He had a learning disorder that required his placement in special education classes at school.

Defendant's great-aunt, Emma Hubbard, began her relationship with defendant when he was about three years old. Her niece, defendant's mother, needed help in caring for defendant and his brothers and sisters. Hubbard then began asking defendant's mother to give defendant to her. Between the ages of 9 and 15, defendant lived with both his mother and Hubbard. During this time, he exhibited strange behavior. He would lower his head and scream for no apparent reason. Also, on more than one occasion, Hubbard gave defendant shoes that were a color he did not like. Defendant would not wear them and would walk outside without wearing any—even in snow. Defendant moved in with Hubbard at age 15.

In 1971, Norma Johnson, a Chicago board of education school psychologist, prepared a psychological report on defendant. She tested defendant, reviewed his school records, and interviewed him and his teachers. Her findings included the following. Defendant was eight years old and in the third grade. However, his reading skills were below kindergarten level and his math skills were at the first-grade level. Defendant and his family lived in a one-bedroom apartment. He and all of his siblings slept in the same bed. Defendant spent his time mainly in the apartment watching television. Fearful of their neighborhood, his mother did not allow him to play outside. He was poorly groomed and had an unpleasant body odor.

Johnson opined that defendant had low self-esteem. He was ill-equipped to handle the academic curriculum. Accordingly, defendant should be expected to experience ridicule from both students and teachers. Defendant behaved immaturely in class; he was "babyish" and "very playful." Since defendant could not receive positive attention based on his academic performance, he behaved in this fashion to gain attention in the only way he could. Further, the Chicago public school system at that time could not supply defendant with the additional

resources he needed, *e.g.*, tutors for his academic deficiencies and social workers for his low self-esteem.

Johnson further opined that defendant was "passively aggressive," *i.e.*, "he did not act out overtly in an aggressive manner, but he may have had some feelings of anger or resentment that he expressed in annoying type[s] of ways, maybe doing irritating things, dawdling, some of the immature babyish behavior *** to get attention." According to Johnson, a passive-aggressive child usually does not physically act out his or her aggressive feelings. The condition does not commonly result in criminal activity. Although the Chicago board of education classified defendant as an educable mentally handicapped (EMH) pupil, Johnson disagreed with this conclusion.

Defendant's mother and his sister, Evelyn Easley, also testified for defendant regarding the Paschal murder. Paschal physically and mentally abused defendant's family. On one occasion, after Paschal beat Evelyn particularly harshly, defendant attempted to speak to Paschal. With cursing and violent threats, Paschal ordered defendant to leave his apartment.

However, Paschal and defendant's brother, Jerome, were close friends; they took illegal drugs together. Further, Jerome always hated defendant; Jerome would tell lies about defendant even when they were young children.

The night before his death, Paschal and defendant's mother had a loud and harsh verbal fight. Paschal even threatened defendant's mother with a butcher knife. Defendant went to the apartment the next night. He peaceably entered through the back door and spoke with Lorraine. He then went to the living room, where Paschal and Jerome were. Defendant told Paschal that he wanted to discuss Paschal's treatment of defendant's mother. Paschal jumped up cursing; defendant continued attempting to speak with him. Removing his wristwatch,

Paschal said, "I told you *** not to come here, and I'm going to teach you something." He began to reach behind the living room television set; everyone, including defendant, knew that Paschal kept a pistol there. Defendant warned Paschal to stop, but Paschal continued to reach behind the television. Defendant shot Paschal once and then fled.

Jerome left the apartment and hailed a passing police car. He falsely accused defendant of violently breaking into the apartment and shooting Paschal without justification. According to Evelyn, the version of events to which Detective Ptak testified was a lie. Speaking to Evelyn and Lorraine alone, police officers ordered them to corroborate Jerome's version of events. If they did not, these officers threatened that Evelyn and Lorraine would live in a foster home and never see their mother again. Their statement to police was a result of this coercion.

In his closing argument at the sentencing hearing, defendant's trial counsel argued that defendant, as with most gang members, turned to a gang as a surrogate family. He sought from his gang the needful things that anyone seeks from his or her family. For defendant, one such need was protection while in prison. While not excusing gangs, defendant's trial counsel attempted to give the jury an understanding of them.

Defendant's trial counsel then discussed defendant's prison record. Counsel dismissed the 64 disciplinary reports for unauthorized movement. He observed that, in actuality, there are no rules in prison and that gangs control prisons in many aspects of daily life. He characterized the testimony of the corrections officers as inconsequential, half-truths, or outright lies.

Now, in this post-conviction proceeding, defendant contends that his trial counsel failed to investigate, prior to trial, mitigation evidence pertaining to: (1) an extreme mental or emotional disturbance, and (2) other areas of

mitigation. Regarding the prejudice prong of *Strickland*, in the context of a death sentencing hearing, a defendant must prove that there is a reasonable probability that, absent counsel's deficient conduct, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Evans*, 186 Ill. 2d at 93-94; *Foster*, 168 Ill. 2d at 489.

### 1. Extreme Mental or Emotional Disturbance

"Under the Illinois murder statute, evidence that a defendant was acting under the influence of an extreme emotional disturbance at the time of the murder is one of the factors to be considered in mitigation, and may be a basis for imposing a sentence other than death." *Foster*, 168 Ill. 2d at 490; see Ill. Rev. Stat. 1987, ch. 38, par. 9—1(c)(2). Defendant refers to a number of reports and affidavits attached to his post-conviction petition in support of this claim.

Several psychiatrists and neuropsychologists evaluated defendant pending disposition of his post-conviction petition in the circuit court. Dr. Bruce Perry, with Dr. Michael Gomez, found that defendant's severe, early-life physical and mental abuse and neglect resulted in post-traumatic stress disorder. They found that "[b]iologically there appears to be little contributing to Mr. Easley's current clinical presentation." However, defendant's severely abusive upbringing lacked the requisites for normal mental development. Drs. Jonathan Hess and Michael Gelbort, in separate evaluations, each found that defendant's behavior indicated neurocognitive dysfunction that correlates with brain injury. All three reports concluded that defendant's socially inappropriate behavior results from neurocognitive dysfunction.

Also, defendant himself asked his trial counsel for a "brain scan." Further, if counsel, prior to trial, had asked them, defendant's mother and great-aunt would have told counsel of defendant's behavior to which they testi-

fied at the sentencing hearing, which would have prompted counsel to further investigate.

A defendant is under the influence of an extreme emotional disturbance when the defendant's emotional state at the time of the murder is at such a fragile point as to leave him or her with little to no emotional control. *Johnson*, 183 Ill. 2d at 206, quoting *People v. Phillips*, 127 Ill. 2d 499, 534 (1989). Here, even assuming that the circumstances surrounding defendant's mental health or this murder would have prompted his trial counsel to explore this particular mitigation strategy, counsel's failure to do so did not prejudice defendant. The State's evidence shows that defendant acted in a rational and composed manner before, during, and after the murder. Also, since defendant attempted to avoid detection, he apparently appreciated the criminality of his acts. See *Easley*, 148 Ill. 2d at 292-95. Given all of the evidence before the jury, we conclude that there was no reasonable probability that the additional evidence now offered by defendant would have caused the jury to find the existence of this statutory mitigating factor. See *Evans*, 186 Ill. 2d at 99; *People v. Henderson*, 171 Ill. 2d 124, 152 (1996).

Further, it must be remembered that proof of this or any other single mitigating factor will not always preclude imposition of the death penalty. Instead, the sentencer should carefully weigh all the aggravating and mitigating factors to reach a fair and just result, one which is based on the particular circumstances of the offense and the defendant. *Evans*, 186 Ill. 2d at 99; *People v. Brownell*, 79 Ill. 2d 508, 537-38 (1980).

We consider the aggravating evidence to be significant. This was defendant's second murder. While imprisoned, defendant has largely disregarded prison authority. He has attacked both his jailors and his fellow inmates. Now, his second victim was a prison supervisor. Defen-

dant's crime was not one of anger or a quick burst of uncontrollable rage. Rather, it was a cold-blooded and calculated assassination of a Department of Corrections official who, as far as the record shows, never harmed or threatened defendant. In light of this aggravation evidence, we hold that, even if defendant had established the existence of this statutory mitigating factor, there is no reasonable probability that the jury would have imposed a sentence other than death. See *Johnson*, 183 Ill. 2d at 206; *Foster*, 168 Ill. 2d at 490-92. The circuit court properly dismissed this claim.

## 2. Other Mitigation Evidence

Defendant next contends that his trial counsel failed to investigate prior to trial several other nonstatutory areas of mitigation. Counsel allegedly failed to assemble mitigation evidence from defendant's family and friends. This testimony would have gone essentially to defendant's disadvantaged and troubled childhood, emotional ties to his sisters and others, and good character.

Defendant also attaches to his post-conviction petition mitigation evidence specifically describing his relationship to his street gang. Defendant argues that "his membership in the gang, while not praiseworthy, reflected a pathetic need for family." .

However, such evidence is not inherently mitigating. *Stewart v. Gramley*, 74 F.3d 132, 136 (7th Cir. 1996). The jury might have considered such testimony to be an aggravating factor. The jury could have regarded defendant's troubled life, with his criminal record and gang involvement in prison, as an indicator of defendant's future dangerousness. See *Mahaffey*, 165 Ill. 2d at 467.

Defendant's trial counsel also allegedly failed to present evidence of defendant's poor academic record. However, such testimony from additional witnesses would have been merely cumulative to the testimony of school psychologist Norma Johnson, which the jury al-

ready heard. Further, evidence of educational disabilities is not inherently mitigating. *Johnson*, 183 Ill. 2d at 203-04.

Defendant next faults his trial counsel for allegedly failing to investigate evidence of defendant's psychological and emotional problems. As with proof of educational disabilities, evidence of mental impairments as described in defendant's evidence is not inherently mitigating. See *Holman v. Gilmore*, 126 F.3d 876, 882-84 (7th Cir. 1997). Proof of these mental deficiencies not only could have evoked compassion from the jury, but also could have demonstrated defendant's continued dangerousness. See *Johnson*, 183 Ill. 2d at 203-04; *Coleman*, 183 Ill. 2d at 406; *People v. Madej*, 177 Ill. 2d 116, 139-40 (1997).

Defendant next claims that "[d]espite his problems and deficits, [he] developed many positive qualities as he became a young adult and moved away from his parents' residence." Defendant faults his trial counsel for failing to present evidence of these positive aspects, specifically including defendant's work history and capacity for rehabilitation.

"[W]e must assess prejudice in a realistic manner based on the totality of the evidence. Accordingly, it is improper to focus solely on the potential mitigating evidence. As our cases illustrate, the nature and extent of the evidence in aggravation must also be considered." *Coleman*, 168 Ill. 2d at 538 (collecting cases). In this case, we have previously described the merciless and dangerous nature of the aggravation evidence. The failure of defendant's trial counsel to place more information from defendant's past onto the scale probably would not have tipped it in defendant's favor. See *Eddmonds v. Peters*, 93 F.3d 1307, 1322 (7th Cir. 1996).

Defendant next faults his trial counsel for failing to present additional details pertaining to the Paschal murder and defendant's guilty plea to that crime. This evi-

dence pertains to the dispute between Paschal and defendant's mother, Paschal's provocation of defendant prior to and at the time of the murder, and the police coercion of defendant's sisters to give false statements. Defendant also presents evidence that: his attorney at the plea conference was at that time suspended from the practice of law, his attorney did not confer with him at the conference, and his guilty plea was not knowing and voluntary.

The proffered evidence pertaining to the Paschal murder is largely cumulative to that presented at the sentencing hearing. The evidence pertaining to defendant's guilty plea does not support his allegations. Defendant's exhibits attached to his post-conviction petition show as follows. *Two* attorneys filed appearances on defendant's behalf; they stood by defendant at, and participated in, the plea conference. Defendant does not now question the credentials of the second attorney. The report of proceedings shows that the circuit court very carefully and thoroughly questioned and admonished defendant to ascertain whether the plea was knowing and voluntary. See 177 Ill. 2d R. 402. During the court's questioning, defendant conferred with his counsel twice. His responses, with two attorneys present, show that his guilty plea was knowing and voluntary and the circuit court so found. To the extent that defendant's proffered evidence presents new information, it probably would not have changed defendant's sentence. See *Jackson v. Roth*, 24 F.3d 1002, 1005 (7th Cir. 1994).

Defendant faults his trial counsel also for failing to present mitigating aspects of defendant's prison record. Defendant now points to his many requests for education. He also notes that of his 154 prison disciplinary reports, only six were for assault and, of those six, four were received after he murdered the victim. To defendant, "[w]hile that is not commendable, it is hardly the

unusual or threatening picture that the prosecution portrayed in aggravation." Defendant also points to an affidavit by Freddie Green, who was a corrections officer at defendant's prison. Green's affidavit included the following. Defendant warned Green of an attack on another guard, thereby preventing it. Also, defendant refused to carry out a gang-ordered "hit" on another inmate. As punishment, some members of defendant's gang were planning to "hit" defendant. Green had defendant moved to another cellhouse.

Favorable evidence of a defendant's conduct while incarcerated is potentially mitigating. *People v. Turner*, 156 Ill. 2d 354, 360 (1993). In this case, however, "[d]efendant's good conduct neither diminished the circumstances of the offense nor lessened his responsibility for its commission." *Turner*, 156 Ill. 2d at 365. While this evidence may be viewed as mitigation, it probably would not have changed defendant's sentence. See *Madej*, 177 Ill. 2d at 140. Further, this evidence can support the inference that defendant, following gang orders, murdered the victim to regain favor with the gang. This evidence thereby indicates defendant's future dangerousness.

Defendant contends that the evidence submitted in his post-conviction petition is at least as mitigating as the evidence in cases that satisfied the prejudice prong of *Strickland*. Defendant relies on several cases in which trial counsel presented very little to no available mitigation evidence at the death sentencing hearing. *E.g.*, *People v. Morgan*, 187 Ill. 2d 500, 513 (1999) (counsel presented two mitigation witnesses whose combined testimony totaled 10 pages of transcript); *People v. Orange*, 168 Ill. 2d 138, 166 (1995) (counsel did not present any mitigation witnesses); *People v. Thompkins*, 161 Ill. 2d 148, 165 (1994) (only mitigation witness was defendant's wife); *People v. Perez*, 148 Ill. 2d 168, 176-77, 185

(1992) (only evidence presented was Department of Corrections psychological report prepared while defendant was imprisoned for prior offense); *People v. Ruiz*, 132 Ill. 2d 1, 21-22 (1989) (sole mitigation witness was police officer who testified that defendant expressed remorse when he was questioned about offenses).

In this case, however, defendant's trial counsel presented to the jury evidence or argument in several major areas of mitigation. The jury received a sense of defendant's: social history; mental and developmental profile; version of the circumstances surrounding the Paschal murder; gang membership as a substitute for family; and prison record as not being egregious, considering gang control of prisons.

True, defendant's trial counsel failed to present additional available evidence in the above-mentioned areas. However, considering the proffered evidence in light of the aggravating circumstances, we conclude that this additional evidence would probably not have precluded defendant's death sentence. See *People v. Thomas*, 164 Ill. 2d 410, 429-30 (1995). We hold that the performance of defendant's trial counsel met the constitutional minimum. See *Jackson*, 24 F.3d at 1005.

As this court's opinion on direct review indicates, this was not a perfect trial. See *People v. Easley*, 148 Ill. 2d 281 (1992). However, a defendant is entitled to a fair trial, not a perfect one. Likewise, ineffective assistance of counsel refers to competent, not perfect, representation. Recognizing these axioms, *Strickland* requires only that a defendant receive a fair trial, *i.e.*, a trial free of errors so egregious that they probably caused the conviction or the sentence. See *Strickland*, 466 U.S. at 686, 80 L. Ed. 2d at 692-93, 104 S. Ct. at 2064; *Griffin*, 178 Ill. 2d at 90-91.

In this case, defendant was convicted of murder and sentenced to death based not on any alleged ineffective

assistance of counsel, but rather on overwhelming evidence. We uphold the circuit court's dismissal of defendant's claims of ineffective assistance of counsel.

## II. Disparate Sentences

Defendant was one of four inmates who were charged with the victim's murder: defendant, Roosevelt Lucas, Michael Johnson, and David Carter. Defendant and Lucas "were originally codefendants in the State's prosecution of Taylor's murder, but their cases were severed before trial." *Lucas*, 151 Ill. 2d at 469. Johnson and Carter were also tried separately. Defendant and Lucas each received a death sentence; Johnson and Carter each received a sentence of natural life imprisonment. Lastly, defendant claims that his death sentence was unreasonably disparate to the sentences of Johnson and Carter.

The controlling principles are settled. Comparative proportionality review in death penalty cases is not required by the United States Constitution and is not a feature of the Illinois death penalty statute. Nonetheless, this court has the constitutional duty to determine whether a death sentence has been imposed arbitrarily or capriciously, or is unduly severe, considering the circumstances of the offense and the character and rehabilitative prospects of the defendant. To guarantee the individualized sentencing that the eighth amendment requires, this court has compared a defendant's death sentence to the sentence of a codefendant or an accomplice. This court has focused on the nature of the offense, each individual's relative involvement, his character and background, and his criminal record and potential for rehabilitation. *Griffin*, 178 Ill. 2d at 89; *People v. Kitchen*, 159 Ill. 2d 1, 44 (1994).

To decide this claim, we must understand the relationship between these defendants. Testimony at Johnson's trial revealed that:

"[T]he BGD gang is organized like a corporation. A

chairman of the board, co-chairman of the board, and board of directors are responsible for setting policy for the organization. Below the board of directors, there is an institutional coordinator and assistant institutional coordinator in each correctional institution. Below them are institutional coordinators of education, treasury, exercise and the United Front Organization (UFO). The UFO is the security arm of the BGD and the institutional coordinator of the UFO is commonly referred to as the chief of security. The chief of security in each institution is responsible for the operations of security in the institution. The function of the chief of security is to provide bodyguards for the board members, make sure certain gang members have weapons, and plan and direct the attacks on staff, other inmates, and individuals within the gang. Subordinate to the chief of security are unit coordinators of chiefs of security for each cellblock or division of the institution.

Larry Hoover was the chairman of the board of directors. *** [Johnson] was the chief of security at the Pontiac facility. David 'Cap' Carter, a subordinate of [Johnson], was the chief of security for the south cellblock. *** [Defendant] and Roosevelt 'Rodog' Lucas were BGD security officers.

After Jones' death, [Johnson] and Carter instructed gang members regarding attacks or murders which were to be carried out against members of the prison administration. Specifically, [Johnson] instructed Carter regarding an attack on Taylor. Carter instructed [defendant] and Lucas to murder Taylor. [Defendant] and Lucas attacked Taylor with a shank and pipe; Taylor died from wounds suffered in the attack." *Johnson*, 250 Ill. App. 3d at 890-91.

Accord *Lucas*, 151 Ill. 2d at 473-74, 479-80.

Defendant now contends that Johnson and Carter "were more culpable" than he because it was *their* order to kill the victim. They "were the organizers and masterminds of the murder." If defendant had not carried out their order, "they would have found someone else to do it." Further, according to defendant, Johnson and Carter have more significant criminal histories and show less potential for rehabilitation than he.

We cannot accept this contention. Although Johnson and Carter issued the order to kill the victim, defendant nonetheless was the actual killer. Thus, a more severe sentence for defendant was justified. See *Griffin*, 178 Ill. 2d at 90; *People v. Byron*, 164 Ill. 2d 279, 303 (1995). Also, we view defendant's criminal history as not significantly less than that of Johnson and Carter. Further, that defendant and Lucas each received a death sentence "persuades us that defendant's sentence was neither arbitrary nor capricious." *Byron*, 164 Ill. 2d at 303. We conclude that defendant's death sentence was not unreasonably disparate to Johnson's and Carter's sentences of natural life imprisonment. We uphold the circuit court's dismissal of this claim.

## CONCLUSION

For the foregoing reasons, the order of the circuit court of Livingston County dismissing defendant's post-conviction petition is affirmed. The clerk of this court is directed to enter an order setting Wednesday, November 22, 2000, as the date on which the sentence of death entered in the circuit court is to be imposed. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1998). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is now confined.

*Affirmed.*

CHIEF JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Easley's murder conviction should not be disturbed. In my view, however, his sentence of death cannot be allowed to stand. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law

violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Easley's sentence of death should therefore be vacated and he should be sentenced to a term of imprisonment. Ill. Rev. Stat. 1987, ch. 38, par. 9—1(j).