2021 IL App (2d) 190184-U
No. 2-19-0184
Order filed March 12, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 03-CF-2073 |
| SCOTT M. HILLIS, | ) ) ) | Honorable John S. Lowry, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Bridges and Justice Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not err in dismissing, at the second-stage, defendant's postconviction petition, alleging ineffective assistance of trial counsel in the first minor's case, where, even considering the alleged alibi testimony, the evidence against him was still overwhelming and he could not show prejudice. However, the court erred in dismissing the petition as to the second minor's case, where the trial court had conducted an improper *Krankel* inquiry and, thus, defendant made the requisite showing that appellate counsel was ineffective for failing to raise the *Krankel* issue on direct appeal. Affirmed in part and reversed in part; cause remanded.

¶ 2    Defendant, Scott M. Hillis, appeals from the second-stage dismissal of his petition for

postconviction relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.*

(West 2018)). In his petition, he challenged his convictions for aggravated kidnapping (720 ILCS 5/10-2(a)(2) (West 2002)) and predatory criminal sexual assault (720 ILCS 5/12-14.1(a)(1) (West 2002)) that entered following two trials and involved two different minor victims, B.W. and G.M. As to the case involving B.W., defendant argues that he made a substantial showing of ineffective assistance of trial counsel for failure to call an alibi witness who would have contradicted the State's evidence about his appearance and whereabouts on the afternoon of the offense. As to the case involving G.M., defendant argues that he made a substantial showing that appellate counsel was ineffective for failing to argue on direct appeal that he was denied a fair hearing consistent with the procedure in *People v. Krankel*, 102 Ill. 2d 181, 189 (1984), where the record corroborated his claim that he was not appointed *Krankel* counsel after a preliminary *Krankel* inquiry. We affirm the dismissal of the petition as to B.W.'s case, but we reverse the dismissal in G.M's case and remand for a third-stage evidentiary hearing.

¶ 3                                    I. BACKGROUND

¶ 4      In the same indictment, the State charged defendant with two separate incidents involving the minors: aggravated kidnapping of B.W. and aggravated kidnapping and predatory criminal sexual assault of G.M. The cases were severed, and defendant opted for a jury trial for the charges related to B.W. and a bench trial for the charges related to G.M. He was found guilty of all counts in both cases and sentenced to 15 years' imprisonment in the B.W. case, to be served consecutively to consecutive terms of 20 and 25 years' imprisonment in the G.M. case, for a total of 60 years.

¶ 5      On direct appeal, this court affirmed the convictions and sentences. *People v. Hillis*, 2-05-0445 (2007) (unpublished order under Illinois Supreme Court Rule 23) (B.W. case); *People v. Hillis*, 2-05-0825 (2007) (unpublished order under Illinois Supreme Court Rule 23) (G.M. case). In 2007, defendant filed a *pro se* postconviction petition, multiple attorneys were appointed to

represent defendant, and an amended petition was ultimately filed on his behalf. The State moved to dismiss the petition, and, in 2019, the trial court granted the State's motion.

¶ 6                                    A. B.W. Case

¶ 7       The incident occurred on July 1, 2002, when B.W. was five years old. B.W., age seven during the jury trial, testified that, on July 1, she and her sister, Brittany, were walking to her friend's house when a man drove up and asked them whether they had seen some kids on bicycles throwing rocks at his car. B.W. described the car as being white with a black stripe around the sides and having four doors. Both B.W. and Brittany told the man that they had not seen anyone on bicycles. The man told Brittany to go look for the kids at one end of an alley, and B.W. started walking toward the other end of the alley. Halfway down the alley, the man, with his car door open and one foot outside of the car, grabbed B.W. and pulled her over his body and onto the front passenger seat of the car. He drove off.

¶ 8       The man instructed B.W. to put her hand over her eyes and to lay down. She did so, but kept taking her hands away. B.W. described the car's front seat as actually having two seats, with "something" in between the seats. She recalled that there were green Mountain Dew bottles inside the car and that there was a hole in the passenger-side dashboard. The seats were blue.

¶ 9       B.W. described the man as having brownish hair and a mustache. She could not recall if his hair was long or short. She also stated that he was "kind of fat," wore a gray shirt with red shorts, and she could not tell if he was tall.

¶ 10      The man touched B.W. on her leg, and she testified that it kind of hurt and that she was scared. She was in the car for about a half hour. The man dropped her off at a golf course and told her to find someone to take her home. B.W. found a man named Harold Pagles, who gave her

a drink and called the police. B.W. identified defendant from a photo lineup as the man who kidnapped her. She also identified defendant in court.

¶ 11 Dawn Giese, B.W.'s mother, testified that, around 7:15 p.m. that day, she noticed that B.W. was no longer playing with Brittany. Brittany told her that B.W. was probably with the man who had asked them to look for some kids on bicycles. Later that evening, after B.W. was brought home, she told Giese that the man had brown hair, a mustache, facial hair, and was wearing a gray tank top with red shorts.

¶ 12 On July 11, 2002, Giese and B.W. were walking into a Save-A-Lot grocery store when B.W. stopped and said that a white, four-door Chevrolet Corsica with black molding and a red pinstripe looked like "the man's car." She did not say she was positive it was the same car.

¶ 13 Brittany, who was 11 years old when she testified, stated that it was about 3 p.m. when she and B.W. were walking to their friends' house. The man who drove up had brown curly hair, a mustache, and hair on his chin. He was kind of fat and wore a gray tank top and red shorts. His car was white with a black stripe, was blue inside, and had four doors. She identified the car in the photographs presented in court. Brittany did not make an in-court identification of defendant and testified that she was not sure if she would know the man if she saw him again.

¶ 14 Pagles, the man who found B.W. at the golf course, testified that B.W. told him that the man's car was white with blue seats and that the man was white with a lot of long hair. Officer Paul Gallagher testified that B.W. gave him the same description of the man's car. She was upset and stated that the man had brown hair and wore a gray shirt and red shorts. She demonstrated that the man touched her knee and then moved his hand up her leg.

¶ 15 Gary Olson testified that, on July 1, 2002, he was at his cousin's house about one block away from B.W.'s home. At about 12:30 or 1 p.m., he walked from the backyard to the frontyard,

where his 4-year-old daughter had been playing with his 4½-year-old sister. There, he saw that a man had pulled up in front of the house and parked in the opposite direction (with the driver's side to the curb), about 10 to 15 feet away from the children. Olson "freaked out" and yelled at the man to get away from the kids. The man immediately made a U-turn, turned right, and "sped off." Olson was about 20 feet away from the car. The man in the car had curly hair. The car was a white, four-door Corsica with a black stripe on the side.

¶ 16    Gary Olson's family did not immediately report the incident. However, later that day, he made a police report because his mother saw a news report that a girl from down the street had been taken. About one year later, Gary Olson spoke with detective Scott Olson and was shown a photo lineup. He immediately identified the third picture as the man from the incident. In court, he identified defendant as the man he saw on July 1, 2002. He was also shown photographs in court and identified them as depicting the car that the man was driving, explaining that it was a white Corsica.

¶ 17    Katrina Fischer purchased a white Corsica from an automobile dealership. She did not change or alter the car after purchasing it. Photos of the car showed that the dashboard had a hole in it, and Fischer confirmed that the hole was in the passenger-side dashboard when she purchased the car.

¶ 18    Detective Scott Olson spoke to Judith Hillis, defendant's mother, who acknowledged that the photos he had taken of Fischer's car were photos of her former car and she was certain of this based on a rust spot on the trunk's lid. She confirmed that defendant would often use the car for several hours at a time and would make excuses to do so. Detective Olson presented a photo lineup to B.W., and she identified defendant from the lineup. Initially, she was not certain he was the man who took her, but, after asking to have a minute to think about it, she identified defendant.

She remembered his eyes, face, and mustache. Brittany was unable to make an identification. Detective Olson showed photos of the car to B.W. and Brittany. B.W. said it was the same car and stated that she remembered the hole in the dashboard and the black stripe that went around the side of the car. Brittany said that the car looked the same and that the blue seats looked the same, but she was uncertain if it was exactly the same vehicle.

¶ 19    Detective Olson showed Gary Olson the photo lineup one or two days later, and Gary identified defendant's photo. He also viewed the photos of the car and stated that they depicted what looked like the same car, a Corsica, but he was not certain it was the exact same car.

¶ 20    Judith Hillis testified that, in July 2002, she owned a white 1992 Chevrolet Corsica and that defendant was allowed to use the car, though he used it only on limited occasions to visit his daughter in Winnebago. Judith could not recall if defendant used the car on July 1, 2002.

¶ 21    After the State rested, the defense played a videotaped interview of B.W. that was taken one day after her abduction. B.W. described her abductor as being a white man with short, brown hair and wearing a gray tank top and red shorts. She described him as "kind of skinny" and stated that he did not have facial hair. B.W. described the car as white with four doors, blue seats, and messy with green Mountain Dew bottles inside.

¶ 22    Detective John Cabello spoke with B.W. on the evening of July 1, 2002. B.W. described the man who took her as having a medium build with black shaved or buzzed hair and wearing a gray shirt and red shorts with a black stripe. She told him that the car was white with a blue stripe and that there were pop bottles inside it. On July 11, 2002, Cabello arrived at the Save-A-Lot, but the white Corsica was no longer there. In his report, he wrote that B.W. told Dawn that she was positive it was the car that took her and described the car as having a red stripe on both sides.

¶ 23    Defendant denied abducting B.W. and testified that he did not recall what he was doing around 6 p.m. on July 1, 2002. He had never seen B.W. before she testified in court and denied ever having a beard. He explained that he only grows sparse hair around his chin, but has occasionally worn a mustache. In the summer of 2002, he weighed around 235 to 240 pounds; at trial, he weighed around 210 pounds. He did not recall Gary Olson or asking anyone to help him find kids throwing rocks.

¶ 24    Defendant agreed that his mother drove a white four-door Corsica and that he had access to and drove the car. He denied that he made excuses to drive the car. He admitted that, in July 2002, he lived with his mother and that she eventually asked him to leave because he had a substance-abuse problem.

¶ 25    On December 17, 2004, the jury found defendant guilty of aggravated kidnapping. Defendant filed a *pro se* motion for a new trial, alleging ineffective assistance of trial counsel. He alleged that counsel failed to present alibi testimony from his boss, Craig Kosin, who would have testified that defendant had worked with him on July 1, 2002, and that sometimes they would work until 7 or 8 p.m. Defendant further claimed that Kosin could confirm that he did not have facial hair at the time of the offense.

¶ 26    On February 11, 2005, the trial court denied defendant's motion and, on March 3, 2005, sentenced him to 15 years' imprisonment. On direct appeal, defendant challenged the sufficiency of the evidence and argued that his trial counsel was ineffective for failing to tender a jury instruction on identification. In 2007, this court affirmed.

¶ 27                                    B. G.M. Case

¶ 28    Emily Smith testified that she babysat G.M. and other children on July 14, 2003. At around 5 p.m., while outside, she saw a man, whom she identified as defendant, speaking with the children.

When Emily approached the man, he asked if there was any construction work available. After Emily told him that she did not know, he left. She went back inside. When she returned outside, the man was there again, talking to the children about playing hide-and-seek. He walked off, and Emily went back inside. When she returned outside, the man was there again, asking the children to pick a color. He left again. The children played hide-and-seek. When it was G.M.'s turn to count, the other children hid. After G.M. stopped counting, G.M. was gone. Emily and the other children tried to find G.M. They saw no one by the man's car. Emily's seven-year-old sister, who was hiding in a car, said that she saw the man take G.M. around the corner.

¶ 29    Emily further testified that the man drove a gold car with a fin on the back. In photographs she identified in court, she noted that the car looked gray. It was a shady day. "It's still the same car." He wore a green T-shirt with an eagle printed on it, blue jeans, and green construction boots. She did not remember how tall he was, nor did she recall telling the police that he was 5' 10" or 6' and 140 to 150 pounds. The man was "slim" and had a mustache and a "little beard."

¶ 30    Four days later, Emily went for a ride with Alexis Alexander, her mother's friend, and defendant. Alexander had been to the DaVita Bio Center to donate blood and was accompanied by defendant. Emily recognized defendant as the man she saw on July 14 and called the police. She later identified defendant in a photo lineup. Emily also identified a Ford Contour belonging to defendant's mother, Judith, as the car she saw on July 14. Emily agreed that Judith's car was green, but testified that the car looked gold on July 14. It was sunny that day.

¶ 31    Rockford police officer Daniel Basile testified that he responded to a call from the individuals who found G.M. G.M. described the suspect as having a mustache and a little bit of hair on his chin. She described the vehicle as silver-colored, but Basile stated that, depending on the light, it looked dark gray or green.

¶ 32    Detective Vernon Simms went to the DaVita Bio Center and confirmed that, on July 18, 2003, an Alexis Alexander had signed in at 12:30 p.m. and a Scott Hillis had signed in at 11:10 a.m.

¶ 33    G.M., age nine at the time of trial, testified that, on July 14, 2003, she was playing outside with her friends. While she was counting during a hide-and-seek game, defendant grabbed her and carried her to his car, forcing her head down inside. After taking her to a nearby school ground, he carried G.M. out of the car and took her to the play area, where he took off her shirt and stuffed it into her mouth. He threatened to kill G.M. if she screamed. He then took her to an area with bushes and pushed her to the ground. Despite her kicking, defendant pulled down G.M.'s pants and underwear and touched her "crotch." He also turned her over and touched her "butt." The man then turned G.M. over again and started "messing with [her] belly button" with his fingers. He then put his penis into her mouth. Finally, the man told G.M. to get up, get dressed, and go to "a blue house" where his friends lived. Instead, G.M. ran to a different house, where "nice people" gave her milk and cookies and called the police.

¶ 34    G.M. further testified that the man wore light brown shoes with brown and yellow laces. She could not recall telling police that the boots were tan. He wore a "tannish" t-shirt with an eagle on it. It was dark out when the man grabbed her. She could not recall describing the man as having blondish hair. G.M. testified that he had a medium build and had a mustache. She could not recall telling police that he also had a beard.

¶ 35    During the investigation, G.M. was shown photographs of Judith's Ford Contour and identified the car as the defendant's car. She also identified defendant in a photo lineup, but did not identify him in court. G.M. identified a shirt with an eagle print recovered from Judith's home.

¶ 36    Judith Hillis testified on defendant's behalf that, on the day of the incident, she owned a 1999 green Concord.  She arrived home around 6:30 p.m.  Defendant was not home, but she heard him in the back yard at a neighbor's barbeque.  She saw defendant around 7 p.m. when he came inside to get some food to take to the barbeque.  He returned home around 10 p.m.  Judith further testified that defendant could not have used her car that day because she had the keys and she was mad at defendant for getting a speeding ticket.

¶ 37    Defendant testified that he worked for Craig Kosin as a construction subcontractor.  He did not leave the job site on July 14, 2003, until 6 or 6:30 p.m.  Kosin drove him.  They dropped of tools and then went to defendant's home.  Defendant arrived home at around 6:45 or 7:15 p.m.  Once home, neighbors invited defendant to a cookout.  He arrived at the cookout at about 7 or 7:30 p.m.  At one point, he returned to his home to retrieve some drinks and food.  Defendant arrived back home at around 10 p.m.

¶ 38    At this time, defendant weighed about 225 to 235 pounds and he had a mustache and no other facial hair.  Defendant explained that he was not able to grow facial hair elsewhere, though he had week-old stubble on his chin during trial.  He was 5'10" tall.  He had a daughter who is the same age as G.M.

¶ 39    Defendant denied that he took his mother's car at 8 p.m. on July 14, 2003.  He acknowledged that he told detective Vernon Simms about his cocaine problem, but denied that he sometimes could not remember things for days on end.

¶ 40    In rebuttal, detective Simms testified that he interviewed Judith on July 24, 2003, and she related that she allowed defendant to use her car on June 14, 2003, and that he returned home at around 10:30 p.m., appearing agitated and disheveled.  She did not mention a barbeque.  Defendant told her he had a bad day and someone had tried to beat him up and rob him.  Simms further

testified that defendant told him that defendant started using drugs on the evening of July 13 and was blacked out until July 16. Simms testified that defendant told him, "I'm not saying that I did this, nor am I denying that I did this. What I'm saying is, is that I just don't remember." Defendant also stated that he was contemplating suicide and that he did not want to have to face anyone.

¶ 41    Detective Scott Olson testified that Judith told him that, on July 14, 2003, she arrived home at 5:45 or 6:15 p.m. and that defendant left after that with her car to visit relatives at a McDonald's restaurant. She also told detective Olson that, when defendant returned home at about 10:30 p.m., it appeared that he had been in a fight.

¶ 42    The parties stipulated that, if called to testify, Kosin would testify that the work schedule he prepared for 2002 and 2003 was a fair and accurate record of the hours defendant worked. He would also testify that, during the week of July 14, 2003, to the best of his recollection, defendant was generally well-groomed and clean-shaven for work and was not impaired with drugs or alcohol while he was at work. Defendant's work records showed that he worked on July 14, 2003, for eight hours.

¶ 43    On May 5, 2005, the trial court found defendant guilty of aggravated kidnapping and predatory sexual assault of a child. The court acknowledged that G.M. did not identify defendant in court, but noted that she had identified him from a photo lineup a few days after the incident and that defendant's appearance in court may not have been the same as it was 1½ years earlier. Also, the witness could have been nervous in the presence of other people in the courtroom. The court emphasized that G.M.'s failure to identify defendant in court was one factor detracting somewhat from the weight of her identification. It was strengthened, however, by the fact that she described and identified Judith's car and the eagle emblem on defendant's T-shirt. The court also noted that Emily had identified defendant both in a photo lineup and in court and that her testimony

was corroborated by her description and identification of the car and T-shirt. The court found that there was little doubt that defendant was the man Emily saw a few days after the incident, as confirmed by his signature when he signed in at the DaVita Bio Center and the fact that defendant did not deny that he rode with Emily and the other woman that day. The court also determined that any discrepancy in the witnesses' descriptions of the color of the car was attributable to the changing lighting conditions.

¶ 44    Addressing defendant's alibi defense, the court determined that Judith's testimony concerning defendant's and her vehicle's whereabouts on the evening of July 14 was impeached by Simms' and Olson's testimony. The court found the detectives' testimony more credible than Judith's testimony, primarily because Judith insisted that the detectives never questioned her about the specific dates and times of defendant's activities. To the court, this was "highly improbable." The court clarified that it did not consider as substantive evidence of defendant's guilt the detectives' version of Judith's prior inconsistent statements. However, their impeachment of her testimony "seriously impair[ed] the credibility of the alibi." Turning to defendant, the court noted the conflict between his testimony that he did not leave his mother's house throughout the evening and that he did not leave in her car with his statement to Simms that he was blacked out from a cocaine binge and did not remember what he had done. He had also stated that he was contemplating suicide and that he did not want to face up to anyone. The court found that, although the statements were not admissions of guilt, they directly conflicted with defendant's trial testimony.

¶ 45    In 2005, defendant filed a *pro se* motion for a new trial, alleging ineffective assistance of trial counsel for failing to interview his neighbors, Ludella[1] and Tom Smith. Defendant asserted that the Smiths would have provided important corroboration for his alibi defense and that one of their children, who was 12 years old at the time, could also corroborate his defense.

¶ 46    At the preliminary *Krankel* hearing on the motion, on June 13, 2005, defendant asserted that the Smiths would have testified that defendant was with them past 10 p.m., having drinks at the cookout. However, they were never subpoenaed. The State responded that trial counsel had indicated that he had spoken to them and that they could not provide an alibi for defendant for the time frame the crime was committed, *i.e.*, sometime after 9 p.m. Trial counsel stated that he spoke to the Smiths, and "there was incongruency." On the phone, Ludella was not cooperative and stated that defendant was at her home until dark. Later, she realized the incident occurred on a Monday and her children had summer school and, therefore, they were inside before dark, specifically, around 7 or 7:30 p.m. because she had to give her children a bath and get them ready for school. Trial counsel further related that he spoke to Tom Smith, who stated he went inside at 5:30 p.m. to play video games with his brother-in-law and that he never stated that he saw defendant. Counsel stated that he did not speak to the Smith's daughter, but that Ludella related that she remembered defendant being at her house that day, but did not recall what time he was there. Ludella also told trial counsel that defendant was one of the "hanger arounds" whom she did not want around all the time.

¶ 47    Defendant responded that his "sources," including his mother and sister, informed him that trial counsel had not spoken to the Smiths and that the Smiths were willing to testify "that I was

---

[1] In the record, Ludella is also called Luann. For consistency, we refer to her as Ludella.

outside with them at the cookout" and he was playing with the children. He asserted that no one mentioned to him the 5:30 or 7:30 times.

¶ 48 The State asserted that it was opposed to removing trial counsel and argued that there was no showing that his performance fell below any objective standard of reasonableness. Addressing the court's concern about whether defendant had an alibi witness and Emily's testimony as to the time she saw defendant, the State argued that she was likely confused because two years had passed since the incident. That evidence would have gone to the weight, not necessarily the credibility, of her testimony. The State asserted that Emily was credible and that the crime occurred at 9 p.m. The court noted that the call to the police occurred at either 10 or 10:30 p.m. The court noted that it did not believe that the crime could have occurred before 9 p.m. and that Emily was mistaken as to the time.

¶ 49 The court determined that there was no basis to appoint *Krankel* counsel, but noted it was troubled by the issue of the Smiths as potential alibi witnesses. It ordered a second hearing to hear live testimony from the witnesses.

¶ 50 The second *Krankel* hearing occurred on August 11, 2005. The State called Ludella Smith, who testified that the July 14 cookout ended around 6:30 p.m. Her husband had gone inside at 5:30 p.m. The children came inside around 7 p.m., and they have an 8 p.m. curfew. "We were inside by 7:00 at the latest." Neither Ludella, Tom, or their kids saw defendant after 7 p.m. She stated that she had been subpoenaed to testify at trial. She spoke to trial counsel and related the same information concerning the end of the cookout, and counsel informed her that she would not need to testify at trial because she would not be able to provide an alibi.

¶ 51 Trial counsel cross-examined Ludella. She testified that the cookout started around 4 or 4:30 p.m. The food was cooked and ready around 5 p.m. At no point did her husband leave the

cookout to go to the gas station. Defendant did not enter her home to play computer games, because Ludella's brother was at the party and the Smiths have only two computers. Ludella believed the party was on a Sunday, when, in fact, it was on a Monday.

¶ 52    The State argued that trial counsel was not ineffective for failing to call Ludella, where, as a matter of trial strategy, the Smiths could not provide an alibi for defendant. Trial counsel, in turn, argued that Ludella could not establish a time frame in which to provide an alibi for defendant and that her confusion as to the day the cookout occurred would have injected confusion in the trial in light of the stipulation from Kosin concerning defendant's work records for the day of the incident, which was a Monday.

¶ 53    The trial court declined to appoint *Krankel* counsel, finding that trial counsel provided effective representation. The court then sentenced defendant to 25 years' imprisonment for predatory sexual assault and 20 years' imprisonment for aggravated kidnapping. He would serve the sentences consecutive to his 15-year sentence for aggravated kidnapping in the B.W. case, for a total of 60 years' imprisonment.

¶ 54    On direct appeal, defendant argued that the trial court abused its discretion in sentencing. In 2007, this court affirmed.

¶ 55                              C. Postconviction Proceedings

¶ 56    On July 12, 2007, defendant filed a *pro se* postconviction petition, alleging general constitutional issues. On September 7, 2007, the trial court found that defendant had stated the gist of a constitutional claim and appointed counsel. On September 27, 2007, he hired private counsel to represent him. Counsel subsequently withdrew, and the court appointed another attorney as postconviction counsel. That attorney withdrew, and new counsel was appointed.

¶ 57    On November 4, 2016, nearly 9½ years after defendant filed his *pro se* postconviction petition, counsel filed an amended postconviction petition, raising claims of ineffective assistance of trial and appellate counsel.  As relevant here, defendant argued as to B.W. that trial counsel was ineffective for failing to contact Kosin as an alibi witness.  In an attached affidavit, Kosin averred that, on July 1, 2002, defendant worked for him between 9 a.m. and 5 p.m.  He did not recall defendant leaving work that day, and his work records did not reflect defendant taking any time off during that workday.  Kosin had picked up defendant at his home in the morning and dropped him off after work at about 5:30 p.m.  Kosin further averred that, some time after July 14, 2003, in late July or early August, Rockford detective Walt Felton and another officer interviewed him. They asked about defendant's appearance, and Kosin replied that he had neatly trimmed hair and no facial hair.  He also related that defendant had reddish-brown hair.  He could not recall if he was asked whether defendant worked for him on July 1, 2002.  Later, Kosin was again interviewed by Felton, but could not recall what he was asked.  After defendant's arrest, Kosin was not interviewed by any attorney representing defendant, and he was never asked to come to court or testify.  Finally, he averred that he was never interviewed or contacted by any attorney from the State's Attorney's office concerning defendant's whereabouts on July 1, 2002.

¶ 58    Defendant also attached to his amended petition the notes of trial counsel's legal assistant, Melissa Lewis,[2] which he asserted were prepared either by her or by trial counsel based on her interview of Kosin. He asserted that trial counsel was thereby aware of Kosin as an important alibi witness.  However, trial counsel never contacted Kosin.  In the undated document, Lewis wrote that Kosin had informed her that, on July 2, 2002, defendant worked until 5:30 p.m. and that he

---

[2] Lewis passed away several years before the hearing on the postconviction petition.

dropped off defendant and his nephew at defendant's home. Kosin also told Lewis that defendant's hair had a reddish-brown cast and that he never had any facial hair, except for a mustache, which was always well-kept. For as long as defendant had worked for Kosin, he never had a beard. Finally, Lewis wrote that she had received from Kosin defendant's work schedule from 2002 and 2003.

¶ 59 As to G.M., defendant alleged that the trial court did not conduct a thorough *Krankel* inquiry (to determine whether trial counsel was ineffective) and failed to appoint *Krankel* counsel after the preliminary inquiry. He also alleged that appellate counsel was ineffective for failing to raise the *Krankel* issue on direct appeal.

¶ 60 The State moved to dismiss defendant's petition, and a hearing was held on the motion on November 30, 2018. On February 28, 2019, the trial court granted the State's motion. As to B.W., the court noted that the defense focused on inconsistencies in the description of the suspect and his vehicle, the photo lineup, and the lack of physical evidence linking defendant to the crime. The court noted that trial counsel's examination of State witnesses revealed that the abduction took place in the evening hours, *i.e.*, after defendant's work hours. Giese, B.W.'s mother, testified that she noticed that her daughter was missing between 6:45 and 7 p.m., and officer Gallagher testified that he responded to the call at about 8:28 p.m. Kosin, the court noted, averred that he dropped off defendant at about 5:30 p.m. and did not recall defendant leaving work that day. The court noted that Kosin's averment that he was never interviewed concerning defendant's whereabouts was contradicted by Lewis's notes, which stated that she spoke to Kosin about defendant's work schedule in connection with both the July 14, 2003, and the July 1, 2002, dates. The court found that defendant had failed to make a substantial showing that trial counsel failed to provide effective

assistance in failing to call Kosin as an alibi witness, because his testimony would not have accounted for defendant's whereabouts at the time of the offense.

¶ 61    As to defendant's claim about the trial concerning G.M., *i.e.*, that the trial judge failed to conduct a thorough *Krankel* hearing, the court found that the judge had examined all of defendant's claims. The trial court determined that appellate counsel was not ineffective for failing to argue that the trial judge did not conduct a proper *Krankel* hearing.

¶ 62    Accordingly, the trial court dismissed defendant's petition. Defendant appeals.

¶ 63                                   II. ANALYSIS

¶ 64    Defendant argues that the trial court erred in dismissing his postconviction petition. He contends that he made a substantial showing of ineffective assistance of: (1) trial counsel in the B.W. case, where his petition showed that counsel failed to contact an alibi witness—Kosin—who would have contradicted the State's evidence about defendant's appearance and whereabouts on the afternoon of the offense; and (2) appellate counsel in the G.M. case, where appellate counsel failed to argue on direct appeal that defendant was denied a fair *Krankel* hearing because the record corroborated defendant's claim that he was not appointed new counsel after the preliminary *Krankel* inquiry.

¶ 65    The Act provides a statutory remedy for criminal defendants who claim their constitutional rights were violated at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. It is not a substitute for an appeal, but rather a collateral proceeding that attacks a final judgment. *Id.*

¶ 66    The Act provides for three stages of review by the trial court. *People v. Domagala*, 2013 IL 113688, ¶ 32. At the first stage, the court may summarily dismiss a petition only if it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2018); *Domagala*, 2013 IL 113688, ¶ 32. At the second stage, counsel is appointed if a defendant is indigent. 725 ILCS 5/122-4 (West

2018); *Domagala*, 2013 IL 113688, ¶ 33. After counsel determines whether to amend the petition, the State may file either a motion to dismiss or an answer to the petition. 725 ILCS 5/122-5 (West 2018); *Domagala*, 2013 IL 113688, ¶ 33. At the second stage, the court must determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *Edwards*, 197 Ill. 2d at 246. If the defendant makes a "substantial showing" at the second stage, then the petition advances to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34. At a third-stage evidentiary hearing, the court acts as fact finder, determines witness credibility and the weight to be given particular testimony and evidence, and resolves any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 67 Defendant's petition was dismissed at the second stage. At the second stage, the allegations in the petition are "liberally construed in favor of the defendant." *People v. Sanders*, 2016 IL 118123, ¶ 31. "All well-pleaded factual allegations must be taken as true[.]" *Id.* ¶ 37. "[T]here are no factual issues" at the second stage. *Id.* ¶ 31. "Credibility determinations may be made only at a third-stage evidentiary hearing." *Id.* ¶ 42.

¶ 68 At the second stage, a court considers only the proofs attached by defendant to his or her petition and the record of the original trial proceedings. *Id.* ¶¶ 45, 48. The Act requires a defendant to attach to his or her petition "affidavits, records, or other evidence supporting the petition's allegations or state why the same are not attached." *Id.* ¶ 45. The court must accept as true both the petition's allegations and its supporting evidence, "unless they are positively rebutted by the record of the original trial proceedings." *Id.* ¶ 48. We review *de novo* a second-stage dismissal under the Act. *Id.* ¶ 31.

¶ 69 Defendant raises claims of ineffective assistance of both trial and appellate counsel. The sixth amendment guarantees a defendant's right to effective assistance of counsel in all critical

stages of criminal proceedings. U.S. Const., amend. VI; *People v. Hughes*, 2012 IL 112817, ¶ 44. This includes a right to the effective assistance of counsel on direct appeal (*People v. Easley*, 192 Ill. 2d 307, 328 (2000)) and in posttrial proceedings (*People v. Miller*, 2020 IL App (1st) 163304, ¶ 61). We review a claim of ineffective assistance of counsel under the familiar standard from *Strickland v. Washington*, 466 U.S. 668 (1984). In the context of a second-stage postconviction ineffective-assistance claim, a defendant must make a substantial showing that: (1) counsel's performance was objectively unreasonable under prevailing professional norms; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36. "The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *People v. Enis*, 194 Ill. 2d 361, 377 (2000). "A reasonable probability is a probability sufficient to undermine confidence in the outcome, namely, that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Id.* at 376. "Matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Smith*, 195 Ill. 2d 179, 188 (2000).

¶ 70    This standard applies equally when a defendant's claim is based on appellate counsel's failure to raise a particular issue on appeal. *Enis*, 194 Ill. 2d at 377. "Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. Easley*, 192 Ill. 2d 307, 329 (2000). "A defendant who contends that appellate counsel rendered ineffective assistance of counsel must show that the failure to raise an issue on direct appeal was objectively unreasonable and that the decision prejudiced [the] defendant." *People v. Childress*, 191 Ill. 2d 168, 175 (2000).

¶ 71                                     A. B.W. Case

¶ 72     Defendant argues that, in light of the exonerative potential of Kosin's testimony, he made a substantial showing that trial counsel was ineffective for failing to call Kosin as an alibi witness. He asserts that Kosin's affidavit raised serious doubts as to whether defendant could have committed the offense. He contends that the affidavit suggests that there was insufficient time for him to find and kidnap B.W. where the window for him to commit the offense was, at most, 1¾ hours, *i.e.*, 5:30 to 7:15 p.m. Next, he contends that the affidavit undermines Gary Olson's testimony that he saw defendant approach his daughter at 12:30 p.m., as Kosin averred that defendant was working at that time. Finally, defendant contends that Kosin's affidavit establishes that defendant did not have facial hair on the day of the offense, contrary to B.W's and Brittany's descriptions of the suspect.

¶ 73     Defendant urges that alibi witness testimony need not account for a suspect's whereabouts during the *entire* commission of the crime; it need only render commission of the offense improbable. *People v. Robinson*, 132 Ill. App. 3d 982, 985 (1971). Thus, he reasons that Kosin's alibi testimony was not useless and that the trial court engaged in improper factfinding when it determined that Kosin's testimony would have no impact on the outcome of the case. Defendant argues that the questions of whether Kosin's testimony could have affected the outcome of the case and whether trial counsel was ineffective for failing to call him as a witness should have been determined at an evidentiary hearing. He contends that Kosin would have provided testimony that contradicted the State's evidence about his appearance and whereabouts on the afternoon of the offense. Specifically, the State presented Gary Olson's testimony that he saw defendant at 12:30 p.m. and that B.W.'s mother realized her daughter was missing at around 7:15 p.m. Kosin, defendant notes, averred that defendant worked for him from 9 a.m. to 5 p.m. on the day of the

offense and that he dropped off defendant at home at around 5:30 p.m. Defendant also notes that B.W. and Brittany described the offender as having a mustache, but that Kosin averred that defendant did not have facial hair on July 1, 2002. (Actually, Kosin averred that, in July or August 2003, over one year after B.W.'s kidnapping, he told detective Felton that defendant had no facial hair.) Taken as true, defendant argues, Kosin's affidavit created serious doubts as to whether defendant could have committed the offense. The affidavit suggested that there was insufficient time for defendant to commit the offense, *i.e.*, between 5:30 p.m. and 7:15 p.m; it undermined Olson's testimony that he saw defendant approaching his daughter, as Kosin averred that defendant was at work at that time; and established that defendant did not have facial hair that day.

¶ 74    Defendant contends that, within the 1¾ hour time frame after he came home and when Giese discovered B.W. was missing, he would have had to change out of his work clothes, convince his mother to lend him her car, find the victim, and plan and commit the offense. A trier of fact, he reasons, could have concluded there was insufficient time for him to commit the offense. Addressing Kosin's affidavit statements concerning defendant's facial hair, defendant contends that this was a factual question concerning his appearance that should be resolved at an evidentiary hearing. Similarly, as to Olson's testimony, defendant argues that Kosin's affidavit shows that another man approached his daughter at 12:30 p.m. on the day of the offense.

¶ 75    The State responds that: (1) defendant's claim is barred by *res judicata* because he did not raise it on direct appeal; (2) alternatively, it is forfeited because it is based on information contained in the record; and (3) defendant's claim fails on the merits, where, even if the work records and affidavit from Kosin constitute additional documentary support, they do not establish an alibi for defendant and, thus, he did not receive ineffective assistance of trial counsel. On the merits, the State argues that trial counsel's performance was not deficient for failing to call Kosin as an alibi

witness. The State asserts that defendant's contentions that Kosin's testimony would have contradicted B.W.'s and Gary Olson's physical descriptions of defendant and provided an alibi for the time of the kidnapping were wholly rebutted by the record, thereby showing that Kosin would not have been a helpful witness. Trial counsel, the State asserts, made a strategic decision not to call Kosin because there was little probative value in his testimony or the work records, where the kidnapping occurred *after* his work hours. Also, as trial counsel related to the court, he did not pursue Kosin because defendant had indicated that he could not remember where he was or what he was doing on the date of the offense. Trial counsel further told the court that Kosin had related that defendant was not a reliable employee. Such information would have negatively impacted the trial. The State maintains that, therefore, trial counsel made a sound strategic decision to set forth a defense that sought to rebut B.W.'s and Olson's identification, rather than establish an alibi. The State also points to affidavits attached to the postconviction petition, in which Kosin averred both that defendant had no facial hair, but also that he had a mustache and reddish-brown hair. This description, it argues, would have corroborated B.W.'s trial testimony that the suspect had brownish hair and a mustache. The State also contends that defendant cannot show prejudice because the evidence against him was overwhelming.

¶ 76   In his affidavit attached to defendant's postconviction petition, Kosin averred that, on July 1, 2002, defendant worked with him between 9 a.m. and 5 p.m. Kosin also stated that he did not recall defendant leaving work that day and that his work records did not reflect defendant taking time off work during that work day. Kosin further averred that, on July 1, 2002, he picked up defendant at his home in the morning and dropped him off at his home after work at about 5:30 p.m. Kosin stated that, in late July or early August 2003 (again, over one year after B.W.'s kidnapping), he was interviewed by Rockford detective Walt Felton. He could not recall whether

he was asked if defendant worked for him on July 1, 2002. He told the detective that defendant had no facial hair. Kosin further averred that he was never interviewed by any attorney representing defendant; asked to come to court to testify; or interviewed or contacted by any attorney from the State's Attorney's office concerning defendant's whereabouts on July 1, 2002.

¶ 77 Also attached to the petition were Kosin's work records for defendant and Melissa Lewis's memo. The work entry for July 1, 2002, states that defendant was paid for seven hours' work. In the undated Lewis document, Lewis wrote that Kosin had informed her that defendant's hair had a reddish-brown cast and that he never had any facial hair, except for a mustache, which was always well kept. She also wrote that, for as long as defendant had worked for Kosin, he never had a beard. Kosin also told Lewis that, on July 2, 2002, defendant worked until 5:30 p.m. and that he dropped off defendant and his nephew at defendant's home. Finally, Lewis wrote that she had received from Kosin defendant's work schedule for 2002 and 2003.

¶ 78 We conclude that the trial court did not err in dismissing the aspect of defendant's postconviction petition relating to trial counsel's performance in the B.W. case, specifically, for failing to call Kosin as an alibi witness. Viewing the entire trial record and construing as true the well-pleaded factual allegations in his petition, we believe that defendant failed to make a substantial showing of ineffective assistance of trial counsel. The evidence of his guilt was overwhelming and, therefore, he failed to make the requisite prejudice showing. Had Kosin testified to the matters in his affidavit, the result of the trial would not have been different. B.W. identified defendant's photo from a photo lineup, and she identified defendant in court. She also consistently identified the vehicle that Judith, defendant's mother, used to own (a white Chevrolet Corsica with blue interior seats), providing, among others, the rather unique detail of the hole in the dashboard. Defendant admitted that, in July 2002, he lived with his mother and could not recall

what he was doing around 6 p.m. that day. He also testified that he had access to and drove her white, four-door Corsica. Judith confirmed that defendant had access to the car, but could not recall if defendant used it on the day B.W. was kidnapped.

¶ 79     Defendant testified that he could not recall where he was on the day of the incident. Had Kosin testified, the jury would have heard that, on that day, defendant worked between 9 a.m. and 5 p.m., *i.e.*, eight hours, and arrived home at 5:30 p.m. The work records showed that he was paid for seven hours, thus, leaving one unpaid hour. Kosin would have testified that he did not recall defendant leaving work and that his work records did not reflect defendant taking time off of work that day. However, Kosin would not have affirmatively testified that defendant was at the job site all day. Gary Olson testified that, on July 1, 2002, at around 12:30 or 1 p.m., he was at a relative's house about one block from where B.W. was kidnapped and saw defendant in a white four-door Corsica near his daughter. He identified defendant from a photo lineup and in court. Thus, Kosin's potential testimony does not absolutely cast doubt on Olson's testimony.

¶ 80     As to defendant's appearance, B.W. testified that the man had brownish hair and a mustache. However, in a videotaped interview one day after the kidnapping, she stated that the man did not have facial hair. Giese, B.W.'s mother, testified that, immediately after the kidnapping, B.W. described the man and having brownish hair and a mustache. Brittany also described the man as having a mustache. Defendant testified that he had occasionally worn a mustache, and, Kosin would have testified that he told detective Felton in July or August 2003 (*i.e.*, over one year after B.W.'s kidnapping) that defendant had no facial hair. Clearly, the Kosin affidavit did not raise a factual question concerning defendant's appearance on the day of the kidnapping.

¶ 81   We conclude that, even if the jury discounted Gary Olson's testimony about seeing defendant midday on the day of the kidnapping one block away from where B.W. was abducted, the evidence overwhelmingly established that defendant kidnapped B.W., and any alleged alibi defense in the form of Kosin's testimony would clearly not have changed the result. The photo-lineup and in-court identifications, along with the identifications of Judith's car and defendant's admission that he had access to and used the vehicle, were highly damaging evidence, as was the generally-consistent testimony that defendant had a mustache (including defendant's testimony that he occasionally wore one). Further, it remains that Kosin could not affirmatively state that defendant was at the job site all day and could not account for defendant's whereabouts after 5:30 p.m.; his affidavit certainly did not render improbable defendant's commission of the crime. We reject defendant's argument that the period 5:30 to 7:15 p.m. was insufficient time to commit the offense. This is speculative and conclusory. See *Sanders*, 2016 IL 118123, ¶ 31 (at second stage, only well-pleaded factual allegations are taken as true). B.W., although only five years old at the time of the kidnapping, testified that the abduction lasted about a half hour, *i.e.*, a short time. Further, no other evidence reflected that the crime would have taken longer than 1¾ hours.

¶ 82   In summary, given that Kosin's proposed testimony would not have led to a different outcome in a trial with overwhelming evidence of defendant's guilt, defendant has failed make a substantial showing of ineffective assistance of trial counsel. Thus, the trial court did not err in dismissing the aspect of the postconviction petition relating to B.W.'s case.

¶ 83                                   B. G.M.

¶ 84   Next, defendant argues that he made a substantial showing that he was denied a fair *Krankel* hearing, where the record shows that the trial judge did not appoint *Krankel* counsel after the preliminary *Krankel* inquiry and that defendant was prejudiced as a result. He also contends that

he made a substantial showing that appellate counsel was ineffective, as the *Krankel* issue was apparent in the direct appeal record. For the following reasons, we agree with defendant.

¶ 85    A common-law procedure has developed following our supreme court's *Krankel* decision, and it "is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel." *People v. Jolly*, 2014 IL 117142, ¶ 29. Under the common-law procedure, the trial court must first (in what is called the preliminary inquiry) and at a minimum (*People v. Roddis*, 2020 IL 124352, ¶ 54), examine the factual basis of the defendant's claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). However, "a trial court [is] able to consider the merits *in their entirety* when determining whether to appoint new counsel[.]" (Emphasis in original.) *Roddis*, 2020 IL 124352, ¶ 61. If the court determines that the claim lacks merit or pertains only to matters of trial strategy, it need not appoint new counsel and may deny the defendant's *pro se* motion. *Moore*, 207 Ill. 2d at 78. "A claim lacks merit if it is conclusory, misleading, or legally immaterial or does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel." *People v. McLaurin*, 2012 IL App (1st) 102943, ¶ 40.

¶ 86    However, if the allegations show "possible neglect" of the case, then new counsel should be appointed. *Id.* The preliminary inquiry's purpose is to allow the trial court to ascertain the factual basis for the defendant's claims and to afford the defendant the opportunity to explain and support his or her claims. *People v. Ayres*, 2017 IL 120071, ¶ 24. In this way, the court can determine whether to appoint independent counsel to argue the defendant's claims. *People v. Patrick*, 2011 IL 111666, ¶ 39. "By initially evaluating the defendant's claims in a preliminary *Krankel* inquiry, the circuit court will create the necessary record for any claims raised on appeal." *Jolly*, 2014 IL 117142, ¶ 38; see also *People v. Jackson*, 2020 IL 124112, ¶ 95. "[T]he inquiry is not burdensome upon the circuit court, and the facts and circumstances surrounding the claim will

be much clearer in the minds of all involved when the inquiry is made just subsequent to trial or plea, as opposed to years later on appeal." *Ayres*, 2017 IL 120071, ¶ 21. The trial court can "base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of trial counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 79. The "preliminary *Krankel* inquiry should operate as a neutral and nonadversarial proceeding" and, because the defendant is not appointed counsel at this stage, the State's participation, if any, must be *de minimus*. *Jolly*, 2014 IL 117142, ¶ 38. As the defendant need only raise a colorable claim of ineffective assistance at a preliminary *Krankel* inquiry, the correct inquiry, in determining whether there was "possible neglect," is to ask whether trial counsel's performance was arguably ineffective. See *McLaurin*, 2012 IL App (1st) 102943, ¶ 40 (claim lacks merit if it "does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel").

¶ 87    Following the appointment of counsel (*i.e.*, *Krankel* counsel), the case proceeds to the second *Krankel* stage, which consists of an adversarial and evidentiary hearing on the defendant's claims and during which *Krankel* counsel represents the defendant. *People v. Downs*, 2017 IL App (2d) 121156-C, ¶¶ 43, 47 (*Krankel* counsel acts as "an advocate for the defendant, not for the State or the trial court") (emphasis omitted). At the second-stage adversarial hearing, *Krankel* counsel must independently review the defendant's *pro se* ineffective-assistance allegations and then must present any nonfrivolous claims (*i.e.*, those with an arguable basis in law or in fact) to the trial court. *Id.* ¶¶ 49-50, 54. "The appointed counsel can independently evaluate the *pro se* claims and avoid the conflict of interest that [the] defendant's trial counsel would experience in trying to justify his or her actions contrary to the defendant's position." *People v. Jackson*, 2020 IL 124112, ¶ 97.

¶ 88 Defendant contends that, at the very least, he made as substantial showing that the trial judge did not follow proper *Krankel* procedure when the court failed to appoint *Krankel* counsel and, further, that he was prejudiced by this failure. He notes that, at the second *Krankel* hearing, he was represented by trial counsel whose performance he was challenging. This conflict of interest, he maintains, was alone sufficient to establish prejudice, as he essentially proceeded without counsel at the second hearing.

¶ 89 Furthermore, defendant argues that, unsurprisingly, trial counsel did nothing to advance his claims against him. He contends that, even though he named three possible alibi witnesses at the initial inquiry—Ludella Smith, Tom Smith, and their 12-year-old daughter—only Ludella appeared at the second hearing. Also, she was not fond of defendant and, when she did not corroborate defendant's alibi testimony that he was at her cookout until 10 p.m., trial counsel did not attempt to challenge her testimony or elicit her bias against defendant. Trial counsel concluded that Ludella could not establish a time frame for the alibi. Here, defendant argues, because new counsel was not appointed, there was no independent evaluation of his claims and we cannot assume that Tom and the couple's daughter would have parroted Ludella's non-alibi testimony. The trial judge, he argues, erred in failing to appoint *Krankel* counsel, and he was prejudiced as trial counsel did nothing to assist him at the second hearing. Defendant further argues that, on direct appeal, appellate counsel was deficient in failing to raise the *Krankel* error. In defendant's view, it was readily apparent from the record that the trial court did not follow proper *Krankel* procedure when it failed to appoint *Krankel* counsel.

¶ 90 The State responds that, despite any procedural irregularities in the *Krankel* hearing, the record clearly shows that no witness could provide defendant with an alibi for the time of the offense. It notes that, at the second hearing, after presentation of Ludella's testimony, who related

that her family was inside the house by 7 p.m. and that she did not see defendant after that, it was clear that defendant's claim was meritless and the court appropriately declined to appoint *Krankel* counsel. The State contends that, even if defendant was entitled to the appointment of *Krankel* counsel at the second hearing, appellate counsel's failure to raise the issue was not objectively unreasonable because no witness was going to provide an alibi for defendant at the time of the offense.

¶ 91    Alternatively, the State argues that, even if appellate counsel's decision not the raise the issue was objectively unreasonable, there was no prejudice, because the only remedy would have been a new *Krankel* inquiry, which would not have revealed an alibi.

¶ 92    Finally, the State argues that, to the extent we conclude that there was error in the *Krankel* proceedings, any such error was harmless beyond a reasonable doubt, as the result would have been the same absent the error. It contends that defendant's ineffective-assistance claim pertained to trial strategy and would not have changed the outcome of the trial. Thus, defendant's *Krankel* claim was without merit and any erroneous manner in the conduct of the proceedings was harmless.

¶ 93    We conclude that defendant made a substantial showing that appellate counsel was ineffective in failing to argue on direct appeal that defendant was denied a fair *Krankel* hearing, where the record shows that defendant was not appointed *Krankel* counsel for the second hearing. The trial court erred in failing to appoint *Krankel* counsel to represent defendant during the evidentiary hearing. The case law is clear that a second-stage *Krankel* inquiry consists of an adversarial and evidentiary hearing where *Krankel* counsel, not trial counsel, advocates for the defendant. See, *e.g.*, *Downs*, 2017 IL App (2d) 121156-C, ¶¶ 43, 47. Here, at the hearing where Ludella Smith testified, defendant was represented by trial counsel, *i.e.*, the very person whose performance was at issue.

¶ 94    Furthermore, even at the preliminary inquiry and contrary to the State's assertion, the State's participation was more than *de minimus*. The State did not, for example, merely provide for the court clarifications of the trial court record. Rather, it argued against defendant's motion. For example, the State argued, "Judge, I don't believe there is a showing that [trial counsel's] performance fell below any objective standard of reasonableness. I think he put forward the best defense that he could. You yourself observed his conduct in this courtroom, and we are opposed to removing [trial counsel] from the case."

¶ 95    The State also argues that, despite any procedural irregularities, defendant's claims lacked merit (*i.e.*, no prejudice could be shown) and appellate counsel was, therefore, not ineffective for failing to raise the *Krankel* issue on direct appeal. It contends that, even if defendant was entitled to appointment of counsel at the second hearing, the record shows that no witness was going to provide an alibi for him at the time of the offense.

¶ 96    At the preliminary *Krankel* inquiry, trial counsel stated that he had spoken to the Smiths. Ludella was not cooperative and stated that defendant was at her home until dark. However, later she told trial counsel that she was mistaken about the day and that her family was inside by around 7 or 7:30 p.m. (The incident occurred around 9 p.m.) Tom Smith, per counsel, went inside to play video games at 5:30 p.m. and never stated he saw defendant. Trial counsel did not speak to the Smiths' daughter, but Ludella related that her daughter recalled defendant being at the house but not what time he was there. Defendant disputed trial counsel's characterization of his conversations with the Smiths, asserting that his "sources" informed him that counsel had not spoken to them and that the Smiths were willing to testify.

¶ 97    At the second *Krankel* hearing (at which defendant was represented by trial counsel, not *Krankel* counsel), Ludella testified consistent with trial counsel's representations at the

preliminary inquiry. She related that Tom had gone inside at 5:30 p.m. and that the rest of the family was inside by 7 p.m. She also testified that neither she, nor the rest of her family, saw defendant after 7 p.m. Ludella related that she had spoken to trial counsel at the time of trial, had relayed the same information concerning the end of the cookout, and that counsel told her she would not need to testify at trial because she could not provide an alibi for defendant. When trial counsel cross-examined Ludella, he elicited that she believed the cookout was on a Sunday. (The incident occurred on a Monday.) The trial court determined that defendant received effective representation by trial counsel.

¶ 98   We disagree with the State that the evidence elicited at the *Krankel* hearing showed that defendant's claims lacked merit. Given the flawed procedure, including the court's failure to appoint *Krankel* counsel, there was never a full assessment of the merits of his claim. At the preliminary inquiry, defendant disputed trial counsel's characterization of his conversations with the Smiths. Defendant asserted that three individuals—Ludella and Tom Smith and their daughter—could offer support for his defense. The trial court found that this aspect of his claim warranted an evidentiary hearing. However, the court did not appoint *Krankel* counsel and only Ludella was called to testify at the second hearing. Although she did not generally offer favorable testimony for defendant, testimony *was* elicited she was confused as to the day of the cookout. Further, as neither Tom nor their daughter testified, the nature of their testimony, including whether they could provide alibi testimony, remains unknown. Given trial counsel's and defendant's different representations of their potential testimony, there is a factual question concerning whether they could have provided alibi testimony. For this reason, we also reject the State's harmless-error argument, where it asserts that no witness was going to provide an alibi for

defendant and that defendant's claim pertained to a matter of trial strategy and would not have changed the outcome of the trial.

¶ 99 In summary, the trial court erred in dismissing the portion of defendant's petition addressing appellate counsel's performance in G.M.'s case. Accordingly, we remand for an evidentiary hearing on that claim.

¶ 100                                III. CONCLUSION

¶ 101 We note our great displeasure that this case has languished for an inordinate and inexcusable amount of time. The crimes occurred in 2002 and 2003, the direct appeals were decided in 2007, and defendant filed his *pro se* postconviction petition that year. However, counsel did not file an amended postconviction petition until 2016, nearly 9½ years after defendant had filed his *pro se* petition. Although there were several changes in representation during postconviction proceedings, it is inexcusable that the postconviction petition was not more expeditiously addressed below.

¶ 102 For the reasons stated, the judgment of the circuit court of Winnebago County is affirmed in part and reversed in part and the cause is remanded for an evidentiary hearing on the claim concerning G.M.'s case.

¶ 103 Affirmed in part and reversed in part; cause remanded with instructions.