NOTICE
Decision filed 11/20/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220332-U

NO. 5-22-0332

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Clinton County. |
| | ) | |
| v. | ) | No. 15-CF-141 |
| | ) | |
| DIEGO C. SALAZAR, | ) | Honorable |
| | ) | Stanley M. Brandmeyer, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAUGHAN delivered the judgment of the court.
Justices Moore and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's order granting the State's motion to dismiss defendant's postconviction petition is affirmed where defendant failed to show prejudice for his claims of ineffective assistance of his trial and appellate counsel and failed to show his postconviction counsel provide unreasonable assistance.

¶ 2    Following a bench trial, defendant, Diego Salazar, was convicted of two counts of criminal sexual assault, in violation of section 11-1.20(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-1.20(a)(1) (West 2014)) and was later sentenced to two concurrent terms of 10 years' imprisonment in the Illinois Department of Corrections. Defendant appeals the trial court's May 3, 2022, order granting the State's motion to dismiss defendant's fourth amended postconviction petition. For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4    On September 14, 2015, defendant was charged, by information, with two counts of criminal sexual assault in violation of section 11-1.20(a)(1) of the Code (*id.*). Count I alleged that defendant placed his fingers in T.B.'s vagina. Count II alleged that defendant placed his tongue on T.B.'s vagina. An arrest warrant was issued, and defendant was arrested on October 13, 2015.

¶ 5    The details of defendant's trial, including the evidence submitted therein, were previously addressed in this court's disposition affirming the judgment and sentence on direct appeal. See *People v. Salazar*, 2019 IL App (5th) 170032-U. Accordingly, we will only briefly address the evidence and limit the facts in this decision to those that relate to the current claims.

¶ 6    Dr. Deborah Treacy's testimony was submitted through admission of her video deposition because she could not appear at trial. Dr. Treacy examined T.B. on August 13, 2015. When the State asked the doctor what T.B. said during the exam, defense counsel objected on hearsay grounds. The trial court overruled the objection, stating that such testimony fell under the hearsay exception under Illinois Rule of Evidence 803(4)(B): Statements for Purposes of Medical Diagnosis or Treatment. Dr. Treacy then testified that T.B. told her that when she woke up, "she found Mr. Salazar on top of her with his fingers in her vagina." Defense counsel did not object to the doctor's testimony about T.B.'s statement identifying defendant as the offender. Dr. Treacy found no signs of trauma around T.B.'s vagina but testified that the finding was not necessarily inconsistent with what T.B. told her.

¶ 7    During cross-examination, trial counsel handed Dr. Treacy an exhibit which she identified as her report from T.B.'s exam. In addition to the doctor's medical observations, the report contained a statement that "[T.B.] had fallen asleep and woke around 4:30-5:00 a.m. with her pants down and a jacket opened with breasts exposed and Diego putting his fingers and mouth on her

genitalia." It also noted the doctor's observation that "[T.B.] is upset about having to go through the exam and evidence collection process." A transcript and video of Dr. Treacy's deposition were entered into evidence at trial. However, her medical report was not admitted.

¶ 8 At the bench trial on November 29, 2016, Aviston Police Chief Mark Taylor testified first for the State. He testified that he interviewed T.B. about an incident that occurred on or about August 13, 2015. T.B. reported to Chief Taylor that she, Ciera Buffa, Zach Engelmann, and defendant went out "booze cruis[ing]." The group later went to defendant's home in Aviston, Illinois. T.B., Engelmann, and defendant fell asleep on defendant's bed. T.B. was next to Engelmann while defendant was perpendicular to them at the foot of the bed. Buffa slept in the living room. Chief Taylor further testified that T.B. told him that she woke up to "Diego" digitally and orally penetrating her vagina. He later determined "Diego" was defendant and arrested him.

¶ 9 Buffa testified that she was with T.B., Engelmann, and defendant on August 13, 2015. The three picked her up from her home just before midnight. The group then went riding around in Engelmann's car, which defendant was driving. After one or two hours, they went to defendant's home in Aviston. T.B., Engelmann, and defendant slept in defendant's room while Buffa slept on the couch in the living room. Buffa saw Engelmann and defendant leave very early for work, around 5 a.m. or 6 a.m. Shortly thereafter, Buffa went into the bathroom and saw T.B. T.B. asked if Engelmann and defendant left. T.B. and Buffa then went to the living room and Buffa looked outside and saw that the two men were gone. T.B. then "started bawling her eyes." When Buffa asked T.B. what was wrong, T.B. told her that defendant "went down on her" and "he raped her." T.B. stated to her that she was sleeping and woke up to defendant performing these acts and that she did not allow defendant to perform these acts on her. Buffa and T.B. left defendant's residence. T.B. dropped Buffa off at home and then returned to her own apartment. A few days later, Chief

Taylor contacted Buffa, and she went to the police station and gave a written statement of the events.

¶ 10    T.B. testified that on the night before the incident, she, Buffa, Engelmann, and defendant got together and "booze cruised" for a few hours after which they went to defendant's residence. The four of them went into defendant's bedroom and were all on the bed. At some point, she fell asleep with her clothes on. At no time did she engage in any consensual sex. She awoke to the alarm sounding on her insulin pump on the morning of the incident. When she awoke, she saw defendant using his fingers and tongue to penetrate her vagina. Her clothing from the waist down had been pulled down. T.B. told defendant to get away and he apologized. T.B. then pretended to go back to sleep while defendant woke Engelmann to go to work. After defendant and Engelmann left, T.B. told Buffa what occurred. When she got back to her apartment a short time later, T.B. called her current boyfriend, Christopher Tate. She later called another friend, Christian Vaughn, who came to her home. She then showered. T.B. first called the Madison County Sheriff's Office and was told to contact the Aviston Police Department. She gave a statement to Chief Taylor at the police station. She then went to the hospital to undergo a rape-kit exam. She later told Engelmann what happened.

¶ 11    Engelmann testified that defendant woke him up for work the morning after he, T.B., Buffa, and defendant had been out drinking. He, T.B., and defendant had been sleeping in defendant's bed. Before he left, Engelmann noticed that T.B. was sleeping with her breasts exposed and her underwear by her head. Defendant told Engelmann that he had "fingered" T.B. and sucked her breasts. Defendant further stated to him that he would have done more if the insulin pump alarm had not sounded. At the time, Engelmann believed the contact was consensual, although he found it "hard to believe." Engelmann later made contact with T.B. who "was distraught" and

4

"devastated." When T.B. told him what happened with defendant, Engelmann advised her to call the police.

¶ 12 Defendant testified that on the night before the incident, T.B. and Engelmann removed their clothes and slept on his bed in their underwear. Defendant woke when his coworker called early the next morning. He noticed T.B.'s breasts were exposed. At no time did he touch T.B. He later teasingly told Engelmann that he had seen T.B.'s breasts. Engelmann then asked if defendant had sex with T.B. Defendant said no and defendant asked Engelmann the same question. Engelmann told him he did not remember. Defendant was with Engelmann when Engelmann called the police to report the assault. He believed Engelmann made the call because Engelmann had other "trouble" with the police and wanted to help himself.

¶ 13 Elizabeth Terry, a nurse, testified that she examined T.B. after the incident. T.B. "was a little shaken, a little scared, nervous of what we were going to do, not really wanting to be there because she didn't want to be touched or assessed." T.B. appeared quiet and tearful.

¶ 14 At the close of the evidence, the trial court found defendant guilty on both counts of criminal sexual assault. It found T.B.'s testimony was corroborated by Dr. Treacy's medical records, stating,

> "One of the things that I read in the medical records which were admitted without
> objection was a suggestion—rather, maybe not a suggestion, it was a statement that
> was entered into the medical records by the physician—or yet—the physician was
> the person who apparently had dictated it and electronically signed the medical
> records. But there was a suggestion that [T.B.] had told the treating physician that
> among the things that she awoken to was that Mr. Salazar had had his fingers inside

5

of her, that he was—that he had his mouth on her vagina. And then quite ironically there was a statement about sucking on her breast as well from what I recall." The court also pointed out that Nurse Terry and Dr. Treacy testified that T.B. was "experiencing a shock" as further proof that the victim was telling the truth.

¶ 15 Trial counsel did not file a motion for a new trial. The trial court subsequently sentenced defendant to 10 years' imprisonment.

¶ 16 Trial counsel represented defendant on direct appeal. On appeal, defendant argued that (1) the evidence was insufficient to find him guilty beyond a reasonable doubt and (2) T.B.'s hearsay statements to Dr. Treacy and Buffa were improperly admitted. On March 8, 2019, this court rejected the first issue on the merits but held that the hearsay claims were forfeited because trial counsel did not preserve them in a posttrial motion and defendant did not argue plain error. *Salazar*, 2019 IL App (5th) 170032-U, ¶¶ 43-46.

¶ 17 On April 29, 2019, defendant filed a *pro se* postconviction petition. Therein, defendant alleged that (1) he was not given a proper opportunity to challenge Dr. Treacy's deposition testimony and was thus denied his right to confrontation, (2) his trial counsel was ineffective for agreeing to allow Dr. Treacy to testify by deposition, and (3) the trial court committed plain error by allowing hearsay testimony that could not be challenged on cross-examination. The circuit court advanced the petition to the second stage and appointed counsel to represent defendant.

¶ 18 On May 25, 2020, and April 12, 2021, appointed counsel filed amended petitions for postconviction relief. Defendant subsequently hired private counsel who appeared on October 7, 2021. Retained postconviction counsel filed a third amended petition arguing, *inter alia*, that trial counsel was ineffective for (1) failing to object to inadmissible hearsay during Dr. Treacy's deposition, (2) failing to preserve the hearsay issue in a posttrial motion, and (3) failing to argue

her own ineffective assistance of counsel. On February 18, 2022, postconviction counsel filed a fourth amended petition that included the above-stated issues and further argued that Dr. Treacy should not have been allowed to testify as to T.B.'s statement identifying defendant and to her characterization of T.B.'s emotional state which allowed the doctor to act as an improper "corroborating witness." On April 14, 2022, counsel filed a certificate of counsel pursuant to Illinois Supreme Court Rule 651(c), stating that counsel (1) "consulted with the Defendant by phone, mail, electronic means, or in person to ascertain his or her contentions of deprivation of constitutional rights"; (2) "examined the trial court file and the record of the proceedings at the trial"; and (3) "made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions."

¶ 19    The State filed a motion to dismiss. It conceded that Dr. Treacy's testimony regarding the statement identifying defendant was admitted in error but argued the error was harmless. At the hearing on the motion to dismiss, postconviction counsel argued that Dr. Treacy's testimony as a whole should not have been admitted under the medical exception because T.B. did not go to the doctor for a diagnosis, but instead visited the physician to undergo a rape-kit exam in order to collect evidence. Postconviction counsel argued that the trial court relied on the hearsay statements from Dr. Treacy's testimony to assess T.B.'s credibility.

¶ 20    On May 3, 2022, the circuit court granted the State's motion to dismiss the postconviction petition. It found,

> "while the identity of the assailant is not in question, the testimony by the physician
> as to the victim's statements that the Defendant digitally and orally penetrated her
> was cumulative, at worst, yet was not dispositive to the finding of guilt by the Trial
> Court. The Defendant's and other witnesses' testimony about the whereabouts of

7

the Defendant, the statements made by the Defendant to others, and the victim's statements to a friend closely in time to the assault, corroborated the evidentiary issues that the Court relied upon in making its finding of guilt of the Defendant. The Court did not rely upon the testimony of the physician in making that finding of guilt. Thus, the trial and appellate counsel's failure to object at the outset to the inadmissible testimony, or to suggest her ineffectiveness as trial or appellate Counsel is irrelevant to the finding of guilt of this Defendant by the Trial Court."

Defendant timely appealed.

¶ 21                                    II. ANALYSIS

¶ 22    On appeal, defendant argues that the circuit court erred in dismissing his fourth amended postconviction petition because he made a sufficient showing as to the ineffectiveness of his trial and appellate counsel. Defendant argues, in the alternative, that his postconviction counsel failed to provide reasonable assistance by failing to amend his postconviction petition to include a claim that defendant's appellate counsel was also ineffective for failing to request plain error review in defendant's direct appeal. The State argues that defendant's fourth amended postconviction petition was properly dismissed.

¶ 23    The Post-Conviction Hearing Act (Act) provides a mechanism by which a criminal defendant may assert that his conviction resulted from a substantial denial of his constitutional rights. 725 ILCS 5/122-1(a) (West 2020); *People v. Delton*, 227 Ill. 2d 247, 253 (2008). The Act does not provide for a continuance of the prior proceedings. *People v. Harris*, 224 Ill. 2d 115, 124 (2007) (citing *People v. Flowers*, 208 Ill. 2d 291, 303 (2003)). The Act provides "a collateral attack upon the prior conviction and affords only limited review of constitutional claims not presented at trial." *Id.* (citing *People v. Greer*, 212 Ill. 2d 192, 203 (2004)).

8

¶ 24　"The Act provides a three-stage process for adjudicating postconviction petitions." *People v. Huff*, 2024 IL 128492, ¶ 19. "At the first stage, the circuit court must, within 90 days of the petition's filing, independently review the petition, taking the allegations as true, and determine whether 'the petition is frivolous or is patently without merit.' " *People v. Hodges*, 234 Ill. 2d 1, 10 (2009); see also 725 ILCS 5/122-2.1(a)(2) (West 2020).

¶ 25　A meritorious petition will advance to the second stage of proceedings. *Greer*, 212 Ill. 2d at 204; 725 ILCS 5/122-2.1(a)(2) (West 2020). At the second stage of proceedings, if requested, counsel will be appointed to assist with amendments to defendant's initial petition (see *People v. Johnson*, 2021 IL 125738, ¶ 27 (citing 725 ILCS 5/122-4 (West 2016))) and "the defendant bears the burden of making a substantial showing of a constitutional violation" (*People v. Pendleton*, 223 Ill. 2d 458, 472-73 (2006)). At this stage, the State may respond to the defendant's petition by either filing an answer or a motion to dismiss. *Johnson*, 2021 IL 125738, ¶ 27. If the petition survives the State's motion to dismiss, the petition advances to the third stage where an evidentiary hearing is held. *Pendleton*, 223 Ill. 2d at 472-73. We review a trial court's dismissal of a defendant's postconviction petition at the second stage *de novo*. *Johnson*, 2021 IL 125738, ¶ 28.

¶ 26　Here, defendant's fourth amended postconviction petition alleged claims of ineffective assistance of counsel, both by his trial counsel, or, in the alternative, his appellate counsel who had also been his trial counsel. Claims of trial counsel ineffectiveness are governed by the standard enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (applying *Strickland* to claims related to trial counsel). To succeed on an ineffective assistance of counsel claim, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's performance prejudiced the defendant. *People v. Cathey*, 2012 IL 111746, ¶ 23 (citing *Strickland*, 466 U.S. at 687). "More specifically, a

9

defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). "[A] defendant must establish both prongs of the *Strickland* test, such that the failure to establish either precludes a finding of ineffective assistance of counsel." *People v. Cherry*, 2016 IL 118728, ¶ 31. Therefore, "[a] court may resolve a claim of ineffective assistance of counsel by reaching only the prejudice prong, as a lack of prejudice renders irrelevant the issue of counsel's alleged deficient performance." *People v. Hall*, 194 Ill. 2d 305, 337-38 (2000). Prejudice is shown where "there is a reasonable probability that that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *People v. Simms*, 192 Ill. 2d 348, 362 (2000).

¶ 27 Defendant argues that his trial counsel provided unreasonable assistance due to counsel's failure to object to Dr. Treacy's deposition testimony pertaining to T.B.'s hearsay statement identifying defendant as the perpetrator. He argues that he was prejudiced by the failure to object because the trial court's reliance on Dr. Treacy's hearsay statements improperly bolstered T.B.'s credibility and the State's entire case hinged on that credibility. Therefore, the trial court's consideration of the hearsay was prejudicial despite the trial court's reliance on other sources to determine defendant's guilt. We disagree.

¶ 28 The outcome of defendant's trial did not depend on Dr. Treacy's recitation of the hearsay statement, even if it was improperly admitted. The record reveals that overwhelming evidence, in addition to T.B.'s testimony at trial, supported the judgment of guilt. T.B. consistently told the Aviston police chief, her cousin Buffa, and her friend Engelmann of defendant's offensive actions, within 48 hours of the alleged incident in a consistent manner. Both Buffa and Engelmann testified to T.B.'s distress when relaying the details to them. Further, Engelmann testified that defendant

10

told him that he sucked T.B.'s breasts and performed oral sex on her. Here, the record contradicts defendant's claim of prejudice as the record overwhelmingly reveals the consistent statements provided by T.B. were corroborated by defendant's admission to Engelmann. Given the consistent and overwhelming evidence, we cannot find that Dr. Treacy's testimony was anything other than cumulative. See *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009) ("Evidence is considered cumulative when it adds nothing to what was already before the jury." (citing *People v. Molstad*, 101 Ill. 2d 128, 135 (1984))). Therefore, even if it was error for the trial court to admit the evidence, we cannot find that its inclusion prejudiced defendant as it does not create a reasonable probability of a different result.

¶ 29     As defendant failed to show that his trial counsel was ineffective pursuant to the means established by *Strickland*, any failure to demonstrate this error on appeal is equally unavailing. Claims of ineffective assistance of appellate counsel are subject to the same *Strickland* analysis. *People v. Easley*, 192 Ill. 2d 307, 328-29 (2000). To be successful on a claim of appellate counsel ineffectiveness, the defendant must show that the failure to raise that issue on appeal "was objectively unreasonable and that the decision prejudiced the defendant." *Id.* "[I]t is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *Id.* at 329. Unless the underlying issues are meritorious, defendant cannot show prejudice stemming from appellate counsel's failure to raise the same issues on appeal. *Id.* (citing *People v. Childress*, 191 Ill. 2d 168, 175 (2000), and *People v. West*, 187 Ill. 2d 418, 435 (1999)). Accordingly, we affirm the trial court's dismissal of defendant's postconviction petition as it related to the actions of his trial and appellate counsel.

¶ 30     Defendant argues, in the alternative, that he was denied reasonable assistance of postconviction counsel when he failed to amend the *pro se* petition into appropriate legal form to

11

allege ineffective assistance of appellate counsel for failure to request plain error review related to the trial court's consideration of Dr. Treacy's medical report when the report was not entered into evidence thereby denying his due process rights. He avers that although postconviction counsel filed a Rule 651(c) certificate, the record rebuts the presumption that postconviction counsel complied with the rule. Again, we disagree.

¶ 31    There is no constitutional right to the assistance of counsel in postconviction proceedings. *People v. Addison*, 2023 IL 127119, ¶ 19 (citing *People v. Custer*, 2019 IL 123339, ¶ 30). However, when counsel is provided, either by appointment or retention, the defendant is only entitled to a "reasonable level of assistance." *Id.* (citing *People v. Flores*, 153 Ill. 2d 264, 276 (1992)). This is a lower level than that provided by the federal and state constitutions because trial counsel and postconviction counsel have different roles. *Id.* The role of postconviction counsel is to shape the defendant's "complaints into the proper legal form and to present those complaints to the court." *Id.* (citing *People v. Owens*, 139 Ill. 2d 351, 365 (1990)).

¶ 32    Illinois Rule 651(c) is used to ensure postconviction petitioners receive the proper level of assistance. Ill. S. Ct. R. 651(c) (eff. July 1, 2017). That rule requires the postconviction attorney to consult with the defendant by a sufficient method "to ascertain his or her contentions of deprivation of constitutional rights," examine the record of the trial proceedings, and make any amendments to the *pro se* petition initially filed by defendant. *Id.*

¶ 33    "Compliance with the rule is mandatory [citation], but once postconviction counsel files a Rule 651(c) certificate, a rebuttable presumption of reasonable assistance arises [citation]." *Addison*, 2023 IL 127119, ¶ 21. To overcome the presumption, the defendant must show that postconviction counsel did not substantially comply with the Rule 651(c) requirements. *Id.* For example, defendant could rebut the presumption by showing that postconviction counsel failed to

make all the necessary amendments, including those to overcome procedural bars. *Id.* Here, postconviction counsel filed a facially valid Rule 651(c) certificate.

¶ 34 As shown above, defendant argues that postconviction counsel failed to provide reasonable assistance of counsel by failing to allege ineffective assistance of appellate counsel for her failure to request plain error review on direct appeal which would have allowed the appellate court to address the trial court's error in considering Dr. Treacy's report, despite trial counsel's failure to properly preserve the issue. However, defendant's claim was never alleged in his *pro se* petition.

¶ 35 Postconviction counsel is not required to add claims to the *pro se* petition; postconviction counsel needs only amend those claims previously asserted by the defendant. *Pendleton*, 223 Ill. 2d at 475-76. "Counsel's responsibility is to adequately present those claims which the *petitioner* raises." (Emphasis in original.) *People v. Davis*, 156 Ill. 2d 149, 164 (1993). Defendant "is not entitled to the advocacy of [postconviction] counsel for purposes of exploration, investigation and formulation of potential claims." *Id.* at 163. Here, no mention of Dr. Treacy's report, or the hearsay contained therein, was mentioned in defendant's *pro se* petition. As such, we find postconviction counsel was not required to assert this claim under Rule 651(c).

¶ 36 However, even if the claim had properly been asserted by defendant, Rule 651(c) does not require postconviction counsel to assert meritless claims in an amended petition. *Greer*, 212 Ill. 2d at 205. Any claim of plain error in this regard would be meritless because, for the reasons stated above, the prejudice required for a first prong plain error claim cannot be shown due to the overwhelming evidence presented of defendant's guilt at trial. *People v. Boston*, 2018 IL App (1st) 140369, ¶ 98; *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 62. For these reasons, we find the record does not rebut the presumption that postconviction counsel provided reasonable assistance pursuant to Rule 651(c).

¶ 37                          III. CONCLUSION

¶ 38    For the foregoing reasons, we affirm the trial court's dismissal of defendant's fourth amended postconviction petition and deny defendant's claim of ineffective assistance by his postconviction counsel.


¶ 39    Affirmed.